**Michelle GRAHAM, an Infant Under the Age of Eighteen Who Sues by Her Parents, Guardians and Next Friends, Charles GRAHAM and Tammy Graham; and Charles Graham and Tammy Graham, Individually, Plaintiffs,**

v.

**WYETH LABORATORIES, A DIVISION OF AMERICAN HOME PRODUCTS CORPORATION, a Pennsylvania Corporation, Defendant.**

No. 85–1481–K.

United States District Court, D. Kansas.

March 14, 1991.

Andrew W. Hutton, Michaud, Hutton & Bradshaw, Wichita, Kan., Ted Warshafsky, Warshafsky, Rotter, Tarnoff, Gesler, Reinhardt & Bloch, Milwaukee, Wis., for plaintiffs.

Albert J. Knopp, Baker & Hostetler, Cleveland, Ohio, Albert Herrington and Debra Arnett, McDonald, Tinker, Skaer, Quinn & Herrington, Wichita, Kan., for defendant.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, District Judge.

This case was recently reversed by the Tenth Circuit Court of Appeals and remanded for new trial. *Graham v. Wyeth Laboratories,* 906 F.2d 1399 (10th Cir. 1990). Defendant Wyeth, through its counsel A.J. Knopp, now moves for disqualification of this court pursuant to 28 U.S.C. § 455(a), and to bar this court from participation in the retrial of this case on June 18, 1991.[1]

Defendant's complaints are: (a) that the court has already made up its mind, has lost its impartiality, and cannot be impartial in the retrial of the action; and (b) that it has exhibited deference to plaintiffs and hostility to defendant Wyeth. Each claim of the defendant addresses several subparts, and each will be addressed here, although not necessarily in the order raised by defendant.

As an aside, and by way of preface, the court takes up this motion with both surprise and disappointment. This is not to say that the court is disappointed with the filing of such a motion. That is the right of any litigant. The disappointment is with the lack of context and the hostility, even animosity, which seem to pervade the motion. The thrust of the defendant's motion and the allegations therein, asserted through counsel Knopp, are entirely out of character and unbecoming to the lawyer known and held in high regard by the court.

It appears now that counsel Knopp has scoured volume after volume of record for any statement or comment made by the court, to obtain support for the present motion. At the same time, that motion fails to place such comments or findings in their true context and background. The court regrets this approach.

While these claims are crafted by the attorney, they are brought in the name of Wyeth. Again, there is nothing unusual about this. There is some irony, however, in the fact that up to this moment, save for an introduction to a young lady from defendant's claim department, who appeared before the jury to express Wyeth's corporate interest, I have never met anyone from Wyeth. As I explained to counsel at the time of hearing, it would have been far better for all of us, Wyeth included, if during the trial, the president or some corporate executive had been here. This person would have heard the case and learned first hand what was important. It is certainly in the company's interest that this should occur. It would have afforded the president an occasion to know his judge and to make his own judgments.

On March 1, 1991, following review of my trial notes and much of approximately 6,000 pages of trial transcript, together with many exhibits, hearing was held and the motion was taken under advisement. In the course of such a hearing, the trial judge is the respondent of sorts. There is no place actually for arguments pro or con between the adversaries, and none were requested here. In sum, this is a searching time and the hearing is taken up, if for no other reason, to ascertain if we can "reason" together. At the time of hearing, the

---

1. Plaintiff counsel Ted Warshafsky has filed an affidavit opposing the motion (Dkt. No. 300). Defense counsel Debra Arnett and Peter A. Tomaras have filed affidavits in support of Mr. Knopp's affidavit and motion (Dkt. Nos. 302 and 304, respectively).

court also traced certain options, the pragmatics of same, as well as certain ramifications should it elect to decline the motion. Those comments are intended to be incorporated here.

At the outset, no trial judge can lightly entertain the gravity of defendant's claim. I am mindful of my responsibilities and the requisites set forth by the Tenth Circuit Court of Appeals. *See United States v. Gipson,* 835 F.2d 1323 (10th Cir.1988); *United States v. Page,* 828 F.2d 1476 (10th Cir.1987); *Franks v. Nimmo,* 796 F.2d 1230 (10th Cir.1986); *Varela v. Jones,* 746 F.2d 1413 (10th Cir.1984); *United States v. Hines,* 696 F.2d 722 (10th Cir.1982); *Webbe v. McGhie Land Title Co.,* 549 F.2d 1358 (10th Cir.1977); and *United States v. Ritter,* 540 F.2d 459 (10th Cir.1976).

I am also mindful of my own responsibilities and duties, appreciating that if there is no basis for recusal, I should not do so.

The purpose of this opinion is to fully address and review each of the defendant's claims in context with the trial, and attempt to recite the reasons for the cited comments or actions of the court which have disturbed the defendant's counsel. The court will proceed here as if any reasonable person, given all of the circumstances, would have no reason to question its impartiality. *United States v. Gigax,* 605 F.2d 507, 511 (10th Cir.1979).

### Some Comments by the Court

Defendant challenges certain comments extended at the time of substantive rulings. First, defendant claims that I have made it absolutely and unequivocally clear that I believe Wyeth's DTP vaccine is defective and caused Michelle Graham's injury. Defendant supports its claim by referring to a statement taken from comments extended by the court at the time of hearing on defendant's motion for judgment notwithstanding the verdict or in the alternative for new trial or remittitur:

Simply said, the plaintiff's evidence showed that endotoxin, a poison, in excessive quantums can invade the cellular process of the blood vessels. If this occurs in the midbrain, which it is shown can occur, a stroke is likely. You may be sure that following the completion of the plaintiff[s'] case, it was my view that the treating physicians of this country ought to know of this situation and, if you will, to this day most of them don't.

(Transcript of 1/29/88 Hearing on Post–Trial Motions, p. 12.)

Defendant further argues that after hearing *only* plaintiffs' evidence, and before hearing defendant's case, the court had already made up its mind and hence had lost its impartiality on the ultimate trial issues. This is clearly *not* the case.

Defendant also asserts a lack of impartiality in a later statement to the same effect, during the same hearing, when I said at page 31 of the January 29, 1988 transcript:

Having said this, I'm also prepared to say now that this fully-tried case says loud and clear that the DTP vaccine can indeed cause encephalopathy and death. I would commend that this most comprehensive record be forwarded for the examination and review not only by defendant's principals but by responsible representatives of FDA and other esteemed authorities. In my view the likes of Drs. Zahalsky and Geier and Gilmartin ought to be invited to their session and to debate, if you will, the merits of their claims and the evidence, but whoever is involved must have at hand this record. The findings in this case in some way ought to be articulated to every physician in this country who momentarily harbors the defendant's view.

Finally, counsel argues that an additional statement made at the same hearing is even more telling of my state of mind. That statement is as follows:

To this day, Wyeth arrogantly chooses to hide behind its ignorance. Their posture throughout this proceeding has been: "If we haven't found this for ourselves, how can it be true?" The jury did not accept this argument. The jury found that Wyeth was completely negligent in its lack of aggressiveness and its lack of concern, and I concur.

Therefore, I don't need any more arguments in any case I think I will ever hear

on Wyeth vaccine about plaintiff's wanting the vaccine to be replaced with a less efficacious variety or wishing to allow whooping cough to proliferate. Such statements by Wyeth, in my view, are completely misleading and totally meritless.

(Transcript of 1/29/88 Hearing on Post–Trial Motions, p. 17.)

Taken wholly apart from their context, some argument can be made that these comments compromise the impartiality of this court. To lend clarity and context to what I did say, however, a reasonable person would want to hear also all that was said with regard to any of these statements, and to further that end the full context of those statements will be presented.

The court's ruling on the defendant's motion for a directed verdict, when plaintiff rested, is a good place to start. Defendant's counsel will note that none of the referenced remarks were made at that point in the trial. I prefaced those rulings as follows:

THE COURT: Let me commence any comment here by recalling what I said when this case opened, somewhere in banter, limine conferences or selection of the jury conferences or what, we're undertaking here what I clearly appreciate to be a rather important and provocative medical question, biologic question. One dearly of interest to the public safety. You're probably correct, Mr. Knopp, that the entire scientific community is watching this case. If the quantums of a daily copy tell me anything that I know is going off. From the trial court's standpoint it's a pleasure to administer the case in that two most able counsel have squared off here. I don't know how the issues that are of interest here could be better presented than through Mr. Warshafsky or better defended at the hands of Mr. Knopp. You both are most knowledgeable with regard to the sensitive important scientific issues.

(Trial Transcript, p. 2350.)

Defendant's counsel will also recall that at that time I took under advisement the defendant's motion, which is hardly the kind of ruling one would expect from a judge who is already predisposed as to the outcome of the case.

Next, because this hearing adequately traces the evidence to that point, I here recite all of my rulings on defendant's motion for directed verdict at the close of all the evidence. In other words, this case was now headed for the jury's decision. I have deleted the portion of my findings which removed the plaintiffs' claim for punitive damages. Defendant has not objected to this ruling or suggested that such a ruling would somehow denote bias.

"THE COURT: Well. All right, let me say again that this case truly has been fully tried, and if you will, probably more fully tried than any DTP vaccine of date. I'm comfortable in saying I'm sure that includes the White [v. Wyeth Laboratories, Inc., 40 Ohio St.3d 390, 533 N.E.2d 748 (1988)] case, and if in time, Mr. Knopp, you see our friend Judge Marcus, please say to him that I'm certain that he would truly have enjoyed the trial of this case, first as a trial lawyer, knowing something about the contribution he has made in the successful trial of provocative cases of this sort; and certainly as a trial judge. You'd have him understand that I am ever certain he would have enjoyed it, probably more from the vantage point of an appellate level; or the Toner [v. Lederle Laboratories, 779 F.2d 1429 (9th Cir.1986)] case which is of interest here. We used it in the opinion, and since this case commenced have had the benefit of the 9th Circuit's decision. If there's anything left to either compound or to further cumulate this case, perhaps it would come from the likes of some others; perhaps authorities of the Bureau of Biologics; consultants to FDA, such as Doctors Pittman or Manclark or their successors. Perhaps, if from the Plaintiff, Dr. Fibin or Stuman or Volpe. Even perhaps Dr. Baraff as it appears at least to me he is not necessarily in concurrence with conclusions drawn from the Body–Baraff–Cherry

drawn from the Body–Baraff–Cherry studies as are professed by the Defendant; or perhaps the writers of *Nelson.* As an aside, years ago a prominent neurologist commended that text to me for my own library, and I drew upon it from time to time coming to grips with a given neurologic problem. To this date I don't recall visiting any family practitioner's office or pediatric's office or internist's office or any neurologist's office where that text is not on his back bar. As for the Defendants, perhaps we could have heard from Dr. Cherry or maybe even Dr. Mortimer, and I'm sure there's others, all of whom could only serve to cumulate the record here. I must say as an aside that both counsel have probably bootlegged more authoritative material and opinions into evidence than was actually offered. We've heard from Mayo's and John[s] Hopkins and many others. Even so, notwithstanding who else could be called to compound or corroborate the respective views, it's my certain opinion that as of this moment nothing would be changed as to the adversaries['] resolution of these most provocative important issues, the thrust of which says: Does the DTP vaccine cause or contribute to encephalopathy, a permanent brain injury; and if so, why; and if known, what can be or should be done about it?

"I suppose, again as an aside, the very posture of these issues as of this moment is a tribute to the state of preparation and readiness at the hands of respective lead counsel. I do not recall a case that's been so thoroughly discovered and so thoroughly researched, so well organized and so well articulated. You have both truly gone to the mat. You've both exhausted the subject, every aspect, every nuance, every morsel. There's just nothing left.

"So now with the benefit of your brief from Defendant and some reflection, it's time for substantive decision as it pertains to these motions. In doing so I'll give credence to the Plaintiff's claims, as I must, and mindful of my responsibilities as most recently set forth in *Celotex* and *Anderson,* and I am prepared to fully rule as to each. I must say that I have also done my homework. I welcomed this weekend for review and for reflection. It was, again, an occasion to review my own notes and organize my thoughts and prepare the comments that will follow. I would say as well, I reviewed the Plaintiff's trial brief. When first presented it said to me that I am in for the trial of a very complex complicated kind of case and terminology and relevance and significance with some mystery. But having reviewed it again quietly, it puts in place this entire case, at least insofar as the Plaintiff's case is concerned.

"I think it's best to first recall that when Plaintiff rested I took Defendant's motions under advisement knowing that the Plaintiff's evidence arguably articulates a prima facie case as to all issues. Notwithstanding how simple and direct the issues appear, and notwithstanding the persuasive [e]ffect of Plaintiff's witnesses and the evidence as it may appear, I simply asked: Are there not uncontroverted and scientific answers for each, the thrust of which would wipe away those claims? I think you can recall that my concern from the outset was that I'm just not interested nor want the responsibilities for the litigation of a provocative scientific issue, the findings of which would belie scientific truth. I mentioned to you then that I had addressed that subject in a case of *Johnson* [*Johnston*] *vs. United States* [597 F.Supp. 374 (D.Kan.1984)] where I had attempted to point out the importance of foundation for scientific evidence. I reminded counsel of my own concern, which is to say that a witness may be qualified, and many say that they are, but the issue I have is: Does that witness know what he's talking about as pertains to the physical evidence pertinent to the case at hand? Has he considered it, and as a consequence, does he rule it in or rule it out? If Rule 702 has significance, the witness's knowledge will assist the fact finder, yet he must be conversant with the facts at hand and not necessarily conversant in the field per se. Thus you will recall I encouraged voir dire prodding from both sides and from which some discretionary judgments could be

reached as to the presentation of the opinions. Credibility of an expert, of course, is for the jury; but unfounded opinions ought to be ruled out at the outset, and for my part, that decision is mine. Thus, I urged both counsel to dig deep, prod and to explore fully if you can. As to the Defendant, it was urged that it place on the table some or any uncontroverted scientific basis which would preclude the right of any lay jury the right to intrude; and that test was to be applied to each expert in this case.

"Now, given all the evidence, the Plaintiff's case says that the Wyeth whole cell vaccine causes or contributes to encephalopathy. It says that endotoxins, perhaps in excessive and unpredictable quantums, given a circumstance, can disrupt the vascular tissue, penetrate the brain barrier, and damage the brain as its consequence. Dr. Zahalsky and Dr. Geier support this. Dr. Gilmartin, a neurologic pediatric, concurs. Given a host of material, research findings, coupled even with Defendant's inneroffice papers and their findings, opinions of others, and a host of them, Dr. Zahalsky and Geier and Gilmartin are not alone. But is it so? The Defendant claims it cannot happen, and thus we hear from Dr. Bogash, Tint, Bierly, Irwin, Levner, Deitch, Bernstein and perhaps others. From it collectively we learn all there is to hear as to the history and the development of their whole cell Pertussis vaccine. We understand much as to its process. We become conversant with such terms as agglutinogens, opacity, agglutinations, detoxification, potency and toxicity. We understand the latter term also deals with levels of endotoxin. And endotoxins, we understand, a pyrogen or a poison, which is agreed to speak for fever and hypotension, even convulsive seizures. By the testimony of the Wyeth people such findings are accepted out of hand, though only thought to be temporal in nature.

"No one can question but what this company is processing a complex organism and the resultant vaccine is of considerable benefit to the public safety. Its use has nearly eradicated the whooping cough, a dread disease, and, of course, in the public's interest, this company is highly federally regulated and monitored. There is no showing here that this company has been out of compliance with any of the FDA requisites.

"The Defendant seems to recognize the benefit of some form of accellular vaccine, the thrust of which would likely reduce the presence of endotoxin, and as its consequence, reduce the incidence of adverse responses. According to the Defendant, these problems have been, and their problems have been, that they somehow could not find the appropriate strains or the media or the mix to alter or to attain such a breakthrough. All the while, however, given compliance with that with which they are required, and given the state of the science, they profess that they can safely rely upon the benefit of prominent epidemiologic findings, the thrust of which does not support the Plaintiff's claim. Indeed it is upon the strength of this evidence, and not upon any scientific breakthrough or laboratory or clinical findings, or as I see it, as a consequence of any research of its own, that the Defendant says with confidence: 'There is no relationship between our vaccine and encephalopathy.' Each witness that I've referred has ventured this, and some have volunteered it. Dr. Pollock was first called, and for reasons stated and not referred here, he did not survive. Dr. Ross was called, and given defense counsel's persuasive plea to draw upon Dr. Cherry's abstract as if gospel, and Dr. Hooker's findings that all vaccines are the same, he survived. Now, I'm not the fact finder, but recalling cross-examination of that witness, Dr. Ross' findings just aren't all that conclusive and uncontroverted. And, of course, we heard from Dr. Hewlett. It was on the strength of his appearance here that I was somehow to ignore certain testimony, even strike Dr. Zahalsky's findings, as considerable weight was to be affixed to his testimony. To say his testimony is uncontroverted or gospel insofar as the state of the science is concerned is nonsense. He is just another voice, if you will, not all that authoritative as compared with others. Simply another person willing to state and explain his views. To be sure, through the likes of these witness[es'] testimony, in direct, whoever called, and sharp cross-examination,

the issues were shaped, narrowed, [finely] honed. They are not, however, resolved in some uncontroverted way.

"Conversely, this provocative issue is clearly placed on a collision course awaiting timely resolution, and this jury and the impartial intelligent body which has listened most patiently and attentively here, the labor and the [quest] for truth will appropriately decide the issue, and for all to hear. In time I'm convinced whomever wins, should there be an appeal, the decision in this case will be a most important one, a far reaching one as to its consequences, and will exceed the weight of anything assigned to that of *White* or *Toner* or others.

"This jury will first address the following question: Is there a causal connection between the Wyeth DTP vaccine and encephalopathy? As an aside, I might add that given the extent to which this case has been tried, and while such a decision will wait another day, I'm presently convinced that the jury's findings here, whatever, yes or no, resolves that issue as to any other Wyeth vaccine case, at least pending here. This court is just not going to permit some other jury to reinvent the wheel, but again will save that question for another day.

"Now, since the substantial issue as defined is for the jury, it follows that the resultant issues which flow from an affirmative response are also in order. That is to say, are also for the jury. These include the Plaintiff's claims of negligence and/or strict liability. Here, again giving credence to the Plaintiff, first as pertains to its negligence claims, the Plaintiff states in part that the Defendant company which produces the vaccine for the public safety has a high standard of care. This standard includes the requisite to research and test the ultimate safety of its product. Plaintiff says that it's not enough to stand behind minimal FDA standards and rely upon what others may say and somehow contend that serious risk in the use of its product has not been shown. The Plaintiff's case says that for this company over the years to say it has not been aware of the prospect, if not the likelihood, that its whole cell vaccine does not somehow cause or contribute to encephalopathy is also nonsense.

Their case suggests that this company has a certain duty to explore the prospect; and if affirmative, why; and when ascertained, to do something about it, and to do far more than to present the product in its present state, however effective it may be.

"There is evidence to support the Plaintiff's claim. Moreover, the Plaintiff's evidence supports the argument that through the years this company has not expended .10¢ of its own assets in such a quest. Now, whether such a failure is found and then found to be causative is for the jury.

"Next the Plaintiff's evidence suggests more than a few innovative timely procedures, the thrust of which even in its present form, can reduce the likelihood of serious adverse consequences. Lots, like patients, differ. There are hot lots. Lot 67701 is such a hot lot. It is from this lot that the Plaintiff's vaccine was drawn. It has been known for years the mouse toxicity test doesn't measure the levels of endotoxin. It's also been known by the Defendant that the toxic effect of its own vaccine is due to the high level of its endotoxin. And notwithstanding all that I heard, memo 11 and 12 of Dr. Bernstein says that. The Defendant's annual reports, exhibit 59, offered early on by the Plaintiff, even seem to suggest Defendant's concern as to whether encephalopathies are obscured.

"We heard about the LAL test known by Defendant since at least 1975, if not before. We hear evidence of skin tests for hypersensitivity. Those found in India. We hear suggestions of the taking of electroencephalographic readings before and after inoculation of children. That makes sense. And it seems to me deserving of review. And we hear of the suggestion of autopsies, certainly on some controlled basis, of the brains of mice to ascertain if indeed endotoxin will indeed disrupt the tissue of some mice; or perhaps with consent of the parents of some deceased children, autopsies of those children who have died following the injection. Now, all of this is disclaimed, particularly through Dr. Bernstein, as wholly unreliable. Nor are such tests by autopsy of mice realistic. He points out that the vaccine that would be

pumped into the mice compares to that found in a bottle of it, as Dr. Hewl[e]tt demonstrated. Now, I'm not the fact finder, but even so, if the presence of endotoxin in whatever quantum, gives rise to disruption of the vascular tissue within the mid brain, and gives rise, then, to stroke, wouldn't that be of interest to Wyeth and certainly to FDA? I recall the diethylstilbestrol case tried here wherein the issue is the relationship, if any, between it and carcinogenic effects. And, of course, it is. Point zero six parts per billion of diethylstilbestrol found in the mouse was thought to be the minimal level. And that level was thought to induce carcinogenic effects in the mouse. I recall the livestock company's arguments, but that .06 per billion, which is the nanograms, is akin to a person consuming a hundred plus pounds of beef per day. And to which the FDA would say, even so, it is of significance because diethylstilbestrol is shown to cause cancer.

"As I listened to Dr. Bernstein I had to wonder if the tests that have been proposed here wouldn't be of significance. I'm sure it is that the Defendant has not considered it, and I wonder if FDA is even aware of such findings.

"I also recall Dr. Bernstein's plea that somehow with all of its facilities and its expertise, and he a microbiologist, could not timely autopsy the brains of a mouse. Again, I'm not the fact finder, as I listened to this gentleman my mind ventured to those happy days about the 9th grade in biology class when the big moment for us was to dissect a poor frog with a razor blade and a tweezer in hand. The task was to remove his or her vital organs and to identify each, including the brain. Presently, some must call that a gross autopsy. Of interest was to smear a portion of the brain upon a slide and study the cellular formations through microscope. Now, while I'm not that certain how our process compares to a dissecting of a mouse, and I've only participated in the skinning and dressing of rabbits, squirrels and many birds; for the life of me it never occurred that what we were doing in the 9th grade was an accomplishment of some [feat] unbeknownst to Wyeth. And for my part, Dr. Bernstein's plea was also nonsense, but

that, too, is for the jury who may have been entirely sympathetic and see it differently.

"Next, notwithstanding explanations tendered by Defendant's witnesses, the Plaintiff claims that long before the Plaintiff's injury this Defendant company was in a position to develop the safer vaccine. Here the answer seems to be with an acellular vaccine, the thrust of which retains the product's potency and safety. Momentarily, we learned that the world will await the advent of the Japanese breakthrough in three or so more years. I recall Dr. Bogash: 'You know these Japanese, once they set their mind to it,' he said. But what of Defendant's efforts and their wherewithal? What of project 77–A, Exhibit 49, abandoned. The promise of the Tint patent, or Dr. Long's research, notwithstanding its promise, abandoned; or of the success of the Lilly Tri–Solgen vaccine. By the Defendant's own admission, a better and safer and more prestigious product. Reports of adverse effects are reduced 90 plus percent. A vaccine sought out by physicians two to one over the Defendant's product. In 1974 this company, the Defendant, owned Lilly's patent rights, the rights of process, which is to say, how to make it; and the license to immediately go on the market as Tri–Solgen, a product of Wyeth Lab.

"To this the defendant says: 'But we somehow just couldn't make it. Just couldn't replicate it. The strains are different. The media is not the same. Given our process, FDA won't license it,' and, of course, given the circumstances they shouldn't, nor did they. This jury, however, also knows that production of the Lilly product is four times the cost of production of the Wyeth vaccine, the difference of about twenty cents to eighty cents to produce. Now at that time, 1974 or thereabouts, they owned both vaccines. As I read Dr. Bogash—that is for the jury—he seemed to say: It just doesn't make good business sense to pursue Lilly. After all, the whole cell vaccine is in compliance. It makes good sense to leave it where it lies, a dead product, and proceed with its own, surely then in greater quantums as there is

no place for the physician to go. The sale increase in this evidence is that from 1976 to 1980, Wyeth was on the rise. If such an analysis is thought unfair, I simply say tell that to the jury as they have heard it all. For my part I remain at a loss to follow the defense on this score.

"Next the defendant warnings to the physician and as contained within the insert is claimed to be inadequate. The thrust of this argument is that given the significance of the presence of endotoxin, its quantum, and the fact that each may vary, the hypersensitivity of some patients ought to be of interest, the causative effect that may, if not probably, result of its consequence, all of this would be of interest to any physician to be so apprized [sic], particularly if he or she has a choice of the product, which in the 70's they did, and for the purpose of enhancing the physician's own alert and information, particularly as to the histories of each child and his follow-up, should any complications arise.

"Now, that is my analysis of the plaintiffs' claim on the inadequacy of warning. To this the defendants say that their warnings state incidence between the product's use and all forms of serious reactions, and that they have been reported, however rare; that the defendant's warning is within FDA guidelines and is so approved. It claims immunity as its consequence. This is claimed as if there is a relationship between an association with the use of the product and the causative effect from its use. As Dr. Bierly noted, an association is when two events occur temporally and/or are next to each other. But what he doesn't say is that there's no way in God's world that one can be injured from an association, and everyone in this room knows it and I trust by now that will include the jury tomorrow at 1:00 o'clock. Indeed, if the first question is responded in the affirmative, it will be because the plaintiff's evidence is [accepted] and the presence of endotoxins, its quantums, its unpredictable quantums, does play a role in permanent injury to children. In such an event of that finding, they can surely find that the present form of the defendant's warnings are inadequate.

"Now, having extended the foregoing comment and findings, it follows as well that if the causative relationship is answered in the affirmative, the claims on strict liability also are for the jury. It's clear the claims that defendant's product was unreasonably dangerous flow in several ways. Plaintiff's evidence with regards to the presence and significance of endotoxins and its unpredictable quantums has been reviewed, as have the plaintiff's evidence as pertains to the vaccine and the causative effect, including children who may be predisposed or vulnerable and wherein the vaccine may result in cerebral injury. The defendant's alleged failure or unwillingness to toxiod its vaccine relate to design defect. Additionally, the defendant's warnings in their present state, if believed, pertain to design defect, and these issues are for the jury.

"Now having said this, I have not overlooked the requisites set forth in *Johnson versus American* [*Cyanamid*], 239 Kansas [279, 718 P.2d 1318 (1986)]. I need to address certain issues, as a matter of law. To ascertain if, given all of the facts, the defendant's whole cell vaccine is unavoidably unsafe as contemplated in Restatement 402, Comment K. As indicated, and partially for this reason, I have paid particular and careful attention to all of the evidence adduced in this case. To be sure, the Wyeth vaccine is highly beneficial. No one here suggests that the same shouldn't be available to children, and as it is and as it has been underway, the plaintiffs only say: But subject to conditions far more realistic than in its present form or in the form of 1980. As to the risk, however rare, at least as of that time, 1980, the risk is inherent and will probably be so as a part of any pertussis vaccine within the content of defendant's whole cell vaccine in its present form. The question begs, however, following [*Kearl*] *Pearl versus Lederle*, 172 California Appeals [3d 812, 218 Cal.Rptr. 453 (1985)] which is followed and addressed by the Kansas Supreme Court: One: Has the defendant already minimized the risk to the extent known? Here, given the evidence, much of which I reviewed, it is to say that in the absence of its own

research or on any other, so far as I see, on the issue of whether the presence of endotoxin per se, its quantum, its unpredictable quantum causes or contributes to brain injury is unsettled, and as long as this defendant is content to disregard its own findings and limited studies commenced in such as the 77A study or the prospects noted by Dr. Long, I'm certainly not in a position to say, as a matter of law, that in March of '80 this product was unavoidably unsafe.

"Next, *Pearl* [*Kearl*] suggests a decision of whether an alternative produce was unavoidable. I have already noted that by 1974 the Lilly Tri–Solgen product was on the market, and by my standard, including those of the defendant, was clearly thought to be safer, equally effective vaccine, and in 1974 was in the defendant's hands. For its own reasons, the product was taken off the market, at least not available by the defendant. If you would say by contrast in time when the Japanese product comes on the market and given honest, objective and forthright regard, such a product will probably be deserving of Comment K findings, but for my part and for reasons noted, I will make no such finding as pertaining to the Wyeth whole cell vaccine on the market in March of 1980.

"Third requisite is[,] are the warnings adequate, and I have commented sufficiently on that and I could not say, as a matter of law, that they are.

"There is an additional reason: While I cannot say that the defendant's product is unavoidably unsafe, as a matter of law, and it's one not contemplated in *Johnson* nor included in the *Pearl* [*Kearl*] decision, it is simply this: To this moment, for whatever reason, however sound it may appear to Wyeth and it may be, they deny even the likelihood of a causal relationship, even the possibility, however remote, between the use of its product and serious permanent injury or death. 'It just can't happen,' so says the defendant. Given this posture, indeed even if true, there just is no way its product can hurt anyone, and as long as this defendant and in my view any company persists with its position, this Court, and again in my view, no Court should be persuaded that such a product can also be unavoidably unsafe. Perhaps in time, in

the event of an appeal to the Tenth Circuit, that Court can certify the unavoidably unsafe issue to the Kansas Supreme Court wherein again it could review the *Johnson* decision. But, simply said, Comment K doctrine is not found as a matter of law, nor is it an available affirmative defense in this case.

"Now while probably not all inclusive with regard to my findings, they do complete then as to the substantive issues that have been raised here, if not all of them. While not raised in your motion for directed verdict, there are others, however, that I will address now as they deserve mention. They deserve explanation as I would clarify my rulings.

"First of these are that I will address the sufficiency of the plaintiffs' claim as to the nature and the extent of her injuries, and in concert with certain defenses raised. In turn, I will want to complete then the record with regard to substantive rulings recently made.

"In sum the plaintiffs' claim is that the child was normal from birth in all respects, save for a fixed right gaze through March 17, 1980. Following her innoculation [sic] at about age three months, she underwent fever to a hundred and six degrees and suffered what's been described now as infantile seizures, inconsolable crying and leg puffiness and redness. When finally in the hands of Dr. Gilmartin, given work off at Wesley and by his own staff, given his own examination, encephalopathy, being permanent brain damage with retardation, was found and diagnosed. The child suffering many disabling features and syndromes, including left hemiplagia, Dr. Gilmartin needed no CAT scan to appreciate that massive and catastrophic injury had occurred within the mid brain, nor is his diagnosis in dispute. Given his understanding of the effects from DPT vaccine as previously reviewed, he attributes this event to the innoculation [sic]—that is, the vaccine.

"Now I review this for several reasons: If you will, as to the substantive issue which I have discussed at first, the defense appears to proceed on two levels: First,

aggressive, intelligent, substantive one and which matches the plaintiffs' case as if blow by blow, from a trial Court's view, a joy to officiate, a fair fight and the makings of what I see to be a great trial. **But there's another side to the defense, and particularly as might pertain to the second issue I have just addressed, in my view a darker side akin to a wrecking crew or a hatchet man:** Admit nothing, deny everything, create havoc, raise doubt, perhaps provoke trial error, all the while play the martyr, make a full record, proffer, proffer, proffer as if this case is being tried to the Circuit panel and a jury trial is only some hurdle it must first pass. If you will, the rests [sic] of this is the prejudicial effect it probably has upon this jury. That's not my problem, but it is a disappointment and deserving of mention.

"I saw it coming first as counsel attacked the mother's testimony at every juncture. It was clearly an attempt to prejudice her testimony, cast doubt as to its propriety, even though much of what was raised is not shown to be relevant, and from what I can garner from the evidence, the defendant had to have known that from the outset. The defendant's counsel has addressed every waking moment of the mother and her child since inception, preterm, post-term. They seized upon spotting in pregnancy, her nutrition, the cord size, the jaundice[d] skin, you say. What do you mean? Your panic that you sought a healer and acpuncture [sic] and chiropractic care. If anyone was prejudiced by reason of what I perceive to have been the most demeaning, if not disgusting, form of cross-examination, it had to have been at the hands of defendant's own counsel, whose principals unfortunately were not here to see or to have listened, and being of a decent sort—I'm sure they are—would surely have put a stop to such conduct. And I say to you, Ms. Roth, I know you're all sensitive to this record and that eleven copies of this daily copy are going forward. I would be pleased if you would hand to your president a copy of what I have just said, but you can also have him understand that those problems are the defendant's problems and not of my making.

"The evidence clearly shows that the plaintiffs seem to have withstood it all, and her stories, her history, perhaps bazaar [sic] to the defense counsel, was and is believable to her treating experienced physician who found it not unusual to a frightened mother under the circumstances. Given the whole picture, Dr. Gilmartin waded through and made his own professional judgments and determined what was important and what was not. What was importance [sic] to him, a history of physical and neurologic normalcy, save for the eye gaze, which was Cogen's apraxia, not brain connected, and which was normal otherwise down through the date of her innoculation [sic]. But from that moment forward, at least within days, catastrophic result occurred.

"That's the plaintiffs' case, and to this defendant has also claimed the whole event precedes the shot. This child suffers unexplained stroke, probably within the second month or earlier. It's claimed some satisfaction for having ordered the CAT scan and now read its significant findings as to the CAT scan itself, which was again helpful to confirm the diagnosis of Dr. Gilmartin and the existence of the stroke, but doesn't change a thing. For what it's worth, as I listened to the defendants boasting for call[ing] up the CAT scan, and, as an aside, I wonder if in addition to EEG findings following seizure activity, as proposed by plaintiff's witness, if routine CAT scans of those children reported as encephalopathies wouldn't be of interest if in time a host of cases are shown to be encephalopathy by reason of stroke. It is just a little thing. Seems to me, as well, if Wyeth can't do autopsies, maybe they could CAT scan the mice.

"The defendant first called a radiologist to confirm the stroke and to find the pathology, which was admissible. He's then called upon to extend his expertise, as if a neurologist, to discuss relevant signs and symptoms and to consider the history and to advise the jury as to the timeliness of the stroke, convinced that by any standard that physician's expertise must be limited and not inclusive of that which I would require. When plaintiffs' counsel finally

objected, I struck that testimony as to the latter.

"Next Dr. Guggenheim was called. Somewhat akin to Dr. Hewlett's role, the jury awaits her as her testimony on this score, that is, the timing is of significance, at least so says the defendant. As of that time, my attention turned to what ought to be required if any person, however qualified, is to assign a time frame for the stroke, certainly if it differs from that of Dr. Gilmartin. Whether it is she or Dr. Gilmartin, there are certain physical thumbprints that need to be considered and a requisite level of expertise to reach any opinion. The criteria that I had at hand and prepared in advance of the testimony, includes the following: That she would assume the stroke as reflected in the CAT scan; that she would assume encephalopathy as its consequence, i.e., massive brain damage and which by its nature gives rise to certain syndromes unmistakable in the hands of specialists. We heard as these injuries manifest themselves, the layman's reminder of the cut wires and how proper that is as one understands the effect of brain injury. Those syndromes include the left hemiplagia, and which, in turn, means absent head thrust. I should think any competent specialist would consider the Wesley tests taken at the direction of Dr. Gilmartin and found about Exhibit 86 or Number 86 of those records. I doubt if they are in dispute, and they appear to be objective and I should think relevant and which, by example, include findings of nystagmus not found by Dr. Cibis.

"Of course, the witness's appreciation as to the significance of the DTP vaccine itself, if any, together with the witness's appreciation as to the significance of any endotoxin and its quantum is in order. Who knows? Should an objective expert witness appear and had not been apprized [sic] of the presence or the significance of the shot, and first hears of it from the stand, he or she, like so many others who have appeared in this case, directly or indirectly, including Mayo and Johns Hopkins, may well assign significance. Certainly if it is of no importance, the witness ought to be able to say so and why. In every way, the witness's understanding and grasp of the subject, in my view, is of import and would have been required.

"Next the witness needs a fair history of the child, delivery, pre-delivery, post-delivery. If there is anything untoward, by all means she can raise it. That history, however, will include the fact that when Dr. Hertenstein examined the child by way of full pediatric examination, the child was normal, save for the gaze. What is clear in this case that this gentleman is board eligible for pediatric certification. He only writes down abnormal findings. He did write the fixed right gaze. He did do a complete physical examination, save for the eye, the balance was normal. His complete examination means that he looks at everything, including abdominal sounds, joint mobility, muscle strength, reflexes. He states he examines a lot of complicated reflexes. His examination shows no abnormality, other than the eye. He would have noted anything else.

"The tendered witness would further understand that the diagnosis of the eye was that of Cogen's apraxia and no other, and to note that during the course of that examination, according to Dr. Cibis, the child manifests head thrust.

"Now, given the foregoing, which were at least my requisites and awaited the witness's qualifications, I saw that the defendant was faced with a problem, and I was surprised, and perhaps I should not have been, particularly as to Dr. Guggenheim. I was surprised with both sides in this, the history that I have defined and would require, was not addressed and the witness's experience with DTP and endotoxin was deleted in its entirety. Here my first surprise came when plaintiffs' counsel has no objection to the requested opinion as to timeliness. I only mention this because, again, and as I stated later in this case, if the plaintiff had objected, the witness's testimony would probably cease and would have ceased consistent with the rule that I have outlined in this case and mentioned at the outset of these findings.

"There's some irony to this in that plaintiffs' counsel raised the issues that I have mentioned in his cross and at which time

**1422**

the [defendant] complained. This is the same counsel who insisted that before Dr. Gilmartin could ever testify, his opinion as to causation and correctly argued that he must establish his experience and training in the field with regard to DTP vaccines and endotoxins and their effect. I can recall a heated conference at the bench joined by both defense counsel to remind me of this importance. As I then recall, and because I agreed, the defense counsel proceeded with a thorough and exhaustive voir dire examination which extended for a day and a half, and at which time, insofar as Dr. Gilmartin's credentials are concerned, they grew every [sic] strong. But, as I said, the absence of even a mention of them by Guggenheim presents no problem to the defense counsel and clearly no problem to Dr. Guggenheim. The weight of her testimony is for the jury.

"But this leaves us with a last witness. The reason I have mentioned some of this is to put in place some of my rulings. The last witness being Dr. Bodensteiner. When this gentleman arrives, I have at hand his report; it was submitted to me in conference with regard to the substance of what it is he was going to say and whether it is cumulative. Understand then that he was a pediatric neurologist and that he too will address the time factors surrounding the stroke. As mentioned, we took up discussion with regard to the cumulative effect or the breadth of his testimony. Given defense counsel's representation, I reserved, and correctly so, any comment or any finding, given my comment as to having required some appreciation for the significance of endotoxin as I would have required from Dr. Guggenheim. From what I now know, this witness gets ready. I had presupposed he was already qualified. I put in place my own criteria that I prepared for Dr. Guggeneheim, and which I reviewed, and awaited the witness's testimony.

"Here the doctor is a pediatric neurologist. In very short order, defense counsel moves to the witness's opinion as to the adequacy of the warning. This struck me as a departure from what he was endorsed to testify. Plaintiffs' counsel objected, but also sought an occasion to voir dire that

witness and I agreed, but always presupposing that the witness would pass muster, and when we reached that level, we then addressed the cumulative effect of his testimony or its breadth. It appears that in a case tried, at least discovered within the year, the *Percival* case, his testimony was taken in May of 1987 and at which time that witness testified for some other drug company in some other DTP related claim. He was not called for purposes necessarily similar here in that his interest was with the state of the child's condition and not the significance of the shot or its timeliness. At Page 56 of the transcript of that testimony, the witness has stated unequivocally [sic] that it is his opinion DTP vaccine causes death and DTP vaccine causes brain damage. I appreciate that such testimony is entirely inconsistent with what he ostensibly is tendered here and I appreciate further that such might run to credibility. In other words, if he has changed his mind somehow, or perhaps in his own mind he can testify one way in one Court or one way in another, that is for him. Even so, in twenty-nine years of rather active practice and some seven and a half years here, I have never seen a witness so totally devastated and so totally impeached by his answers to those questions, two questions that put him down and out. If you will, given fortitude, most lawyers would simply want to assist the poor man to his feet and led [sic] him out the door, then return and express regrets to the Court and to the jury. But not so here. I'm as convinced as I'm sitting here that Dr. Bodensteiner never dreamed plaintiffs' counsel was so prepared and so ready with those questions, and I'm also convinced that if it were not for such preparation, this Court, nor the jury, would have never known of his entirely inconsistent position months, short months ago. And I should hope that defendant's counsel was also so surprised and would not dare foist such arrogance upon this jury, but, again, such is probably for the jury, and for my part at that point his credibility was zero. But then we learn—I learn in the course of the witness's discovery deposition of this case taken in July of 1987 he's asked with some precision at

Page 40 about his understanding of endotoxin and the defendant's DTP vaccine. His understanding is zero. He's done no research nor claims expertise. I would surmise that he safely ventured that because he was not to understand that he need address this in this case. He also ventured at Page 40 of that discovery that the vaccine could cause cerebral infarct.

"Now, if this witness is here in this case to address the relevant evidence for his opinion, and whether it's within or without the content of his report, he surely must have been told that he now has to become an expert and have expertise with regard to the vaccine and endotoxin, and here he comes. He first appears here and sits in the back of the room to listen to Dr. Hewlett, and he reads a lot, and apparently he reads fast. He's enamored with Dr. Ross and, guess what, and to the surprise of everyone, including the plaintiffs' counsel, who has every reason to rely upon the findings of his discovery, Dr. Bodensteiner is now an expert, and he has, in his judgment, all of the expertise that is required and he's ready to go. It's no wonder, therefore, that the defendant's counsel could comfortably start the tendering of opinions with the warning issue. I sustained the objection to any testimony of this witness that requires expertise in this field of endotoxin and that of the defendant's DTP vaccine. The significance of that ruling is not only because it's cumulative and a complete departure from that which is tendered, which it is, as to both, but because given revelation here, under no circumstances will I accept the testimony of such a witness, a witness and a person who on at least the previous weeks previously, if his position had held true, possessed no expertise but who somehow nearly overnight becomes all proficient. No such witness will testify in this Court in this case or any case and no adversary need to be so confronted and so surprised. At best the doctor is now conversant with he subject, but clearly there is no way it can be said that he has demonstrated that he knows what he's talking about in this case. Given what discretion that is mine, this witness, nor the likes of him—and I hope I don't meet him again—will testify in this or any case involving similar issues. I appreciate the defense counsel has protected its record and proffered all it should with regard to the doctor's testimony—I guess it went on for several hours—but should this case reach the Circuit panel, I should hope one would at least recite what I have just said and found: There's no way this witness can now be qualified to testify in this case. And, moreover, should defense counsel also claim that the force of my rulings have somehow prejudiced the defendant, I think it ought to be known and stated here, and the reason I mention it, that if defendant Wyeth was prejudiced, it has come solely at the hands of its own counsel. In the course of thirty minutes or so, questions were put to that witness in a machine gun fashion, perhaps well thought out and in some organized fashion, and at which time each was objected to and each sustained. Counsel, at its insistance [sic] to somehow preserve its record, perhaps provoke error for me, persisted and persisted, and throughout it all, from my vantage point I can tell you this jury watched in aghast as if astonished, as if embarrassed for me by such arrogance. This jury by this time, however, should not have been surprised, notwithstanding my early explanation to them as to mention of my ruling when I told them what "overruling" means and "sustained" means, and, of course, that these good lawyers would adhere. This counsel could care less as this case will somehow be tried and his record made any way he pleases, and if counsel today is somewhat pleased for having made his point, fine, but he can tell that to the jury as I don't believe at this time they are all that pleased, and I certainly await his final argument."

(Trial Transcript, pp. 5513–5544 (bold emphasis added).)

Lastly, following receipt of the defendant's massive brief on its motion for new trial or alternatively for judgment notwithstanding the verdict or remittitur as to damages (Dkt. No. 162), I reviewed my trial notes and much of the available record before addressing defendant's motion. Again, I recite my findings as follows:

"THE COURT: Counsel, I scheduled hearing today for several reasons, but the first of which is to take up defendant Wyeth Laboratories' motion for judgment notwithstanding the jury's verdict, or, alternatively, for new trial, or for remittitur.

"As to the first, which is the motion for judgment notwithstanding the verdict, if I were to summarize the substance of it, it [is] to say that Wyeth claims that the plaintiff has failed to produce evidence upon which the jury could reasonably conclude that her injuries were caused or contributed to buy [sic] the DTP vaccine of the defendants, or that there was insufficient evidence upon which the jury could reasonably have found for the plaintiff on any design defect claim, or that the evidence is insufficient to support a reasonable determination by the jury that the whole cell vaccine was defectively designed, or that there simply is no evidence from which the jury could reasonably have concluded that the Wyeth package insert was inadequate or causative, or that the evidence is insufficient to support that Wyeth failed to test or otherwise was shown to be negligent, taking into account industry standards, or that it acted unreasonably. A part of Part 2 of the new trial found at Page 39 of this rather massive brief also suggests that a new trial should be granted because the findings are against the weight of the evidence.

"I think I have reasonably capsuled the defendant's claim on this score, which, for the most part, is the first thirty-eight pages of the motion and perhaps Pages 39 through 45 as well. I will say out of hand I will delete any consideration of the motion as it would pertain to warranty instructions or its application here in that as all of you know, those claims were deleted from this case.

"I will say next that I have reviewed these briefs, plaintiff's reply and the defendant's response to it, and have reviewed as well a wealth of trial material, my own notes, which were rather extensive, and much [of] a part of the transcript of this case, if not all of it.

"So, having said that, I will hear from the defendants.

"MR. KNOPP: Your Honor, on behalf of the defendant Wyeth, actually I don't think that I will burden the Court with anything more. I think we have covered those points that we felt should be brought to the Court's attention in the brief.

"THE COURT: That is your privilege, I guess, Mr. Knopp.

"MR. KNOPP: Very happy to respond to any questions the Court may have, Your Honor.

"THE COURT: No, I think I have it reasonably in mind as I capsuled the case a moment ago and as I have attempted to analyze and review the evidence that was before me, either as to the causative question or whether the DTP vaccine did, in fact, cause the injury to this plaintiff or whether the stroke preceded the shot. I think I have a ready grasp of it. Simply here to hear you if you had **anything else** you wanted to say.

"MR. KNOPP: I do not, Your Honor.

"THE COURT: All right. I take it then that includes any arguments of newly discovered evidence, which is the second part of the motion that is found at Page 45, or as to some claim for remittitur?

"MR. KNOPP: May I have just a moment, Your Honor?

"THE COURT: Sure.

"MR. KNOPP: Your Honor, this is something that I have—do we have extra copies? Your Honor, perhaps I could, while we are searching for a copy for Mr. Warshafsky, and for the Court—an article appeared in *Clinical Pediatrics*, one of the outstanding journals involving pediatrics, it's a case report, some literature review and congenital occular motor apraxia that appeared for the first time in January of '88. I have never been in this position before, Your Honor, where I have been of the opinion that an article appearing in a medical journal may support a motion for a new trial on the basis of newly discovered evidence, but I think because the thrust of this article deals with the fact that the condition that was found by Dr. Cibis prior to the administration of the vaccine is, according to this article and the studies done

by the authors, something that accompanies serious central nervous system problems and not a transient thing such as the body of literature had led most physicians to believe before.

"THE COURT: Shown to be the evidence in this case and is the evidence in this case?

"MR. KNOPP: In any event, I would like to add this article to our motion in support of our motion for new trial based upon newly discovered evidence and offer this in addition to that which—

"THE COURT: You're welcome to offer it. **I'm going to overrule its admissibility insofar as its application here for a motion for new trial. I haven't read it, of course, but I'm certain it is just not that compelling that somehow the trial court should set aside this entire jury trial in the face of all that this jury heard to receive new findings in connection with Cogen's apraxia.**

"MR. KNOPP: May I simply proffer it then or whatever the procedure might?

"THE COURT: Fine. **Anything else?**

"MR. KNOPP: No, Your Honor.

"THE COURT: All right. Well, given that situation, let me proceed in this manner then. I think as pertains to any of the motions, all of them are overruled. But in doing so, I believe it's appropriate that I set out my reasons, and particularly as I would address the motions, argued or not. In doing so, I think first it's best that [I] recite the state of affairs which brings us here.

"Michelle Graham, who is a child now of about eight years of age, through her parents pursued this action for recovery of substantial damages claiming that her brain damage, or encephalopathy, resulted from a stroke which was probably caused or significantly contributed to buy [sic] defendant Wyeth Laboratories' DTP vaccine, which was administered on March 17, 1980. She claims here that the toxins created by the pertussis components of the DTP vaccine can cause vascular injury, including cerebral vascular injury, and probably did in her case. She has premised her action on two theories: Strict liability and/or negligence.

"Now the trial of this case expended approximately two months' time. I recall reciting to counsel on another hearing that this case was fully tried and probably more fully tried than any other DTP case in this country to this date. Given full instructions and the benefit of full arguments by able and well-prepared counsel, a most patient and attentive jury quite readily returned a unanimous verdict. The jury's answer[s] to the special questions are as follows:

"1. Does the Wyeth whole cell DTP vaccine cause or substantially contribute to the cause of encephalopathy in children?

Yes. ___

"2. Did the DTP vaccine received by Michelle Graham on March 17, 1980, cause or substantially contribute to the cause of her encephalopathy?

Yes. ___

"3. In March of 1980, was defendant Wyeth negligent in connection with testing, designing and/or warning in regard to its DTP whole cell vaccine, which was the legal cause of the plaintiff's injury?

Yes. ___

"4. In March of 1980, was the DTP whole cell vaccine manufactured by Wyeth in a defective condition unreasonably dangerous to persons as a result of its design, which was the legal cause of plaintiff's injury?

Yes. ___

"5. In March of 1980, was the DTP whole cell vaccine in a defective condition unreasonably dangerous to persons as a result of inadequate warnings, which was the legal cause of plaintiff's injury?

Yes. ___

"6. What is the total amount of damages sustained by the plaintiff as a result of the injuries to Michelle Graham? By that, what amount of damages were sustained?

$15 million

"Now I will first address the defendant's motion for judgment notwithstanding the verdict and that part of the defendant's motion for new trial which suggests that the judgment is not sustained by the

**1426**

weight of the evidence. As pertains to any of these issues, it is clear to me that the central issue was whether the defendant's whole cell DTP vaccine caused or substantially contributed to the cause of encephalopathy and to the cause of plaintiff's condition in particular. In reaching this decision, Instruction Number 8 set forth with some precision the plaintiff's respective claim and the varied defenses raised by Wyeth. To be sure, these defenses are well in mind and the arguments raised today—not necessarily argued today—have been heard by me more than once. Indeed, I have similarly addressed most of the arguments raised in the motion, again raised here in the defendant's motion. Particularly, I heard them at the time I took up defendant's last motion for directed verdict. Actually that motion, being the motion for directed verdict, and the defendant's arguments then were more complete and comprehensive than any of those that are now raised by the present motions and which are before me now.

"Additionally, counsel will recall, by way of motion for summary judgment, I was asked in part to find as a matter of law that the plaintiff's case was just not actionable. I addressed these arguments with the memorandum of July 21, 1987. To be sure, our research and that memo has served me well in that the opinion is quite complete and I am quite convinced, now more than ever, that it is a complete and a correct statement of the law as it pertains to each and all of the issues raised then and now.

"I was again apprized [sic] of the defendant's arguments as to the validity of the plaintiff's claim on its motion in limine taken up shortly prior to trial. I then had at hand the benefit of the respective trial briefs. At that time the defense was so certain of its position, I was requested to strike the testimony of witness Zahalsky as being unfounded. I thought otherwise and awaited his testimony. I am convinced the record of that procedure is also helpful in understanding the manner in which I intended to undertake the trial of these most provocative issues. I thought the plaintiff's evidence was presented in a creative, yet logical way inasmuch as we were deal-ing here in a most complex field. Plaintiff's counsel wisely elected to call Dr. Zahalsky as their first witness. I found him to be an articulate and well-trained scholar who had done his homework, knew his business, and had come to teach the lay jury what they needed to know with regard to the subject at hand. This included the subjects of pertussis vaccine, antigens and toxins. The witness was quite familiar with Wyeth's involvement and the extent of its contributions to the field, if any. This witness, a professor of immunology, his doctorate in microbiology, had conducted his own research and his findings were of significance and were impressive. Mind you, the jury had been led by defendant's opening statement to understand that Dr. Zahalsky would not really know what he was talking about and would be out of his field. However, this gentleman testified for over a full week's time and the cross-examination was extensive and exhaustive. Through it all, Zahalsky seemed to thrive, and his own credibility was bolstered by his ability to clearly articulate his findings and his views. He defined endotoxins and their significance, particularly their reactions in human organisms. He traced Lot 66701 and persuasively demonstrated its excessive quantum of endotoxin and the significance of this. I believe the plaintiff's trial brief has amply covered the thrust of the witness's testimony as if I were to state it here. In my view, Dr. Zahalsky was an entirely competent and important witness for the plaintiff, thrust of his testimony holding true throughout the course of the case.

"Dr. Zahalsky's testimony was corroborated with that of Dr. Geier. Again, the substance of his testimony was well stated in the plaintiff's brief. For the purposes here, Dr. Geier was found to be competent, and ample foundation was laid for his testimony. Dr. Geier was equally an important witness, and when this gentleman stepped down, there was no question but that endotoxins will indeed cause or contribute to death and/or brain injury.

"Next we heard from Dr. Gilmartin, a local pediatric neurologist who came upon the plaintiff's case and took up her cause.

If one would accept the defense claims, it is to ponder: Just what does this person know—he being just a local pediatrician with some 'off the wall' projections. I recall defense counsel['s] adamant insistence that before Dr. Gilmartin could dare venture his opinions as to the issues of causation and the plaintiff's injury, counsel be permitted to voir dire him as to his foundation. This process elapsed into a day and a half's time, boring in on Dr. Gilmartin's qualifications, his experience, training, research, principally with regard to pertussis vaccines, endotoxins and their significance, if any; additionally, his own grasp as to the plaintiffs' circumstance, the history—all of it. The voir dire process in my view was akin to an extensive discovery process and which served to qualify Dr. Gilmartin as one well-qualified to testify in this or any vaccine case. Simply said, it was my perception that this fine, well-trained, experienced and qualified pediatric neurologist has probably forgotten more about the relevant subject than any of those tendered by any of the defendant's witnesses, and which includes Dr. Hewlett. He was surely well-qualified to state his opinion that the defendant's DTP vaccine caused or substantially contributed to the plaintiff's brain damage and that the stroke was as a consequence of the introduction of the vaccine into the cellular process of the midbrain and to rule out any suggestions that the plaintiff's condition preceded the shot either by way of any form of prenatal or postdelivery complications.

"There was, of course, other evidence offered in the plaintiff's case, but for the most part it came from reams of exhibits—all sorts of paper—the defendant's memoranda, that is to say, production records, laboratory and research data, internal memoranda and many scientific papers. To be sure, when the plaintiff rested, the thrust of their case made much sense to me. Certainly, given what the jury had heard as of then, there was no question but that the defendant's product can cause encephalopathy and that it caused the plaintiff's injury. The defendant has shown to be negligent in several ways, as the plaintiff's evidence addressed all of those enu-merated in the contention section of Instruction Number 8. Indeed, if the plaintiff's evidence is believable, it also follows that the product was unreasonably dangerous as claimed in Instruction Number 8.

**"Simply said, the plaintiff's evidence showed that endotoxin, a poison, in excessive quantums can invade the cellular process of the blood vessels. If this occurs in the midbrain, which it is shown can occur, a stroke is likely. You may be sure that following the completion of the plaintiff's case, it was my view that the treating physicians of this country ought to know of this situation and, if you will, to this day most of them don't."**

"When the plaintiff rested, I took defendant's motion for directed verdict under advisement. I appreciate that there is a complete record of these findings and they are incorporated here. In substance, I concluded that the plaintiff's claim was arguably made. I was cautious at that time, recalling that the defendant had always claimed that the Wyeth DTP vaccine would not cause or contribute to encephalopathy or death in children. 'It just can't happen,' they said, and so told this jury. When pushed, they said, 'Well, it just hasn't been shown to happen ... And, by the way, we've always been in compliance with the FDA requisites. Our product meets the toxicity and the potency test.' Given the certainty of defendant's representations, I awaited and anticipated some evidence, thrust of which would disrupt or drastically controvert the plaintiff's case in some uncontroverted way. I waited and anticipated some evidence of such significance that the plaintiff's claim just couldn't stand. And so I took up the defendant's case in that posture and on completion again addressed the defendant's full motion for directed verdict. As stated, that motion was more comprehensive than the motion for judgment notwithstanding the verdict and motion for new trial that are now before me. I addressed that motion as fully and as completely as I am able. At that time, and while fresh, I had at hand the benefit of a full review of my trial notes, many trial memorandum[s] regarding rulings that transpired in the course of the trial of

this case. Much of the transcript was reviewed by me, together with a host of exhibits. I put in place twenty-nine pages of findings and those comments and conclusions extended at that time are also made a part of my rulings now. If you will, however, some bear repeating here, and I would commence at Page 5517 of that transcript taken up at the time of motion for directed verdict at Line 11 where I said:

"Now, given all of the evidence, the plaintiff's case says that Wyeth whole cell vaccine causes or contributes to encephalopathy. It says that endotoxins, perhaps in excessive or unpredictable quantums, given a circumstance, can disrupt the vascular tissue, penetrate the brain barrier and damage the brain as its consequence. Dr. Zahalsky and Dr. Geier support this. Dr. Gilmartin, a neurologic pediatric, concurs. Given a host of material, research findings, coupled even with defendant's interoffice papers and their findings, opinions of others, and a host of them, Dr. Zahalsky, Dr. Geier and Gilmartin are not alone. But is it so? The defendant claims it can't happen, and thus we hear from Dr. Bogash, Tint, Bierly, Irwin, Levner, Deitch, Bernstein and perhaps others. From it collectively we learn all there is to hear as to the history and the development of their whole cell pertussis vaccine. We understand much as to its process. We became conversant with such terms as agglutinogens, opacity, agglutinations, detoxifications, potency and toxicity. We understand the latter term also deals with levels of endotoxin. And endotoxins, we understand, a pyrogenic or poison, which is agreed to speak for fever and hypotension, even convulsive seizure. By the testimony of the Wyeth people such findings are accepted out of hand, though only thought to be temporal in nature.

"No one can question but what this company is processing complex organism and the resultant vaccine is of considerable benefit to the public safety. Its use has nearly eradicated the whooping cough, a dreaded disease, and, of course, in the public's interest, this company is highly federally regulated and monitored. There is no showing here that this company has been out of compliance with any of the FDA requisites.

"If I depart from the transcript at that point at Line 17 of Page 5518, I would comment that on Page 13 through 15 of the defendant's brief in support of its motion, Wyeth makes a plea to the Court regarding the merits of the whole cell vaccine and how it has wiped out whooping cough, and the defendant queries, 'What would happen if Wyeth or all other DTP manufacturers abandoned the whole cell product and instead marketed a "safer" vaccine which was somewhat "effective" but not *equally as effective* as the proven whole cell product? Would another ten children die each year of whooping cough? Perhaps it would be another fifty or a hundred,' they say. The defendant ends their plea with the tongue-in-check [sic] statement that 'It could be that all of the manufacturers and FDA are wrong about the merits of the whole cell vaccine ...'

"When I read this self-accolade on the whole cell vaccine, my first thought was to wonder if the author of that brief had attended this trial and understood the evidence that was presented. The defendant's statement reveals a deep misunderstanding of the plaintiff's claim and one that is often shared unfortunately by the media and other lawyers.

"The plaintiff has *never* contended that children should not be vaccinated or even that a less efficacious vaccine should be placed on the market. What the plaintiff did argue—and did prove to this jury—was that Wyeth's whole cell vaccine can severely harm some children, yet Wyeth has taken *no steps* to prevent such injuries. The plaintiff agreed that if such injuries were *unavoidable*, the vaccine must still be given. However, the plaintiff's evidence proved that such injuries are *not* unavoidable. Moreover, the conclusions reached by the jury in finding liability *was not necessarily* that Wyeth should have produced a safer vaccine—they could also have concluded that Wyeth *should* have learned more about the injuries its vaccine was causing and how they could be pre-

vented. If such 'prevention' included finding a safer vaccine, Wyeth should have taken steps to find one. The evidence in this case showed that Wyeth did little, if any, research in this area and did not aggressively follow up on adverse reaction reports. Perhaps what this jury concluded was that patients with histories of neurological problems should be warned not to take the vaccine, or at least under close medical scrutiny, and this jury heard how other countries deal with this, including England.

"**To this day, Wyeth arrogantly chooses to hide behind its ignorance. Their posture throughout this proceeding has been: 'if we haven't found this for ourselves, how can it be true?' The jury did not accept this argument. The jury found that Wyeth was completely negligent in its lack of aggressiveness and its lack of concern, and I concur.**

"**Therefore, I don't need any more arguments in any case I think I will ever hear on Wyeth vaccine about plaintiff's wanting the vaccine to be replaced with a less efficacious variety or wishing to allow whooping cough to proliferate. Such statements by Wyeth, in my view, are completely misleading and totally meritless.**

"Now returning to what I said at the directed verdict:

"The defendant seems to recognize the benefit of some form of acellular vaccine, thrust of which would likely reduce the presence of endotoxin, and as its consequence, reduce the incidence of adverse responses. According to the defendant, these problems have been and their problems have been that they somehow could not find the appropriate strains or the media or the mix to alter or to attain such a breakthrough. All the while, however, given compliance with that which they are required and given the state of the science, they profess that they can safely rely upon the benefit of prominent epidemiologic findings, thrust of which does not support the plaintiff's claim. Indeed it is upon the strength of this evidence, and not upon any scientific breakthrough or laboratory or clinical findings, or, as I see it, as a consequence

of any research of its own that the defendant can say with confidence: [']There is no relationship between our way vaccine and encephalopathy.['] Each witness that I referred to has ventured this and some have volunteered it. Dr. Pollock was first called, and for reasons stated and not referred here, he did not survive. Dr. Ross was called, and given defense counsel's persuasive plea to draw upon the Dr. Cherry's abstract as if it is gospel and Dr. Hooker's findings that all vaccines are the same, he did survive. I'm not the fact finder, but recalling cross-examination of that witness, Dr. Ross's findings just aren't that conclusive and uncontroverted. And, of course, we heard from Dr. Hewlett. It was on the strength of his appearance here that I was somehow to ignore certain testimony and even strike Dr. Zahalsky's findings, as considerable weight was to be affixed to his testimony. To say his testimony is uncontroverted or gospel insofar as the state of the science is concerned is nonsense. He's just another voice, if you will, not all that authoritative as compared with others, and simply another person willing to state and explain his views. To be sure, through the likes of these witness' testimony in direct, whoever called, and sharp cross-examination, the issues were shaped, narrowed, finely honed. They were not, however, resolved in some uncontroverted way.

"Conversely, this provocative issue is clearly placed on a collision course awaiting some timely resolution, and this jury and the impartial, intelligent body which has listened most patiently and attentively here, in the quest for truth, will appropriately decide the issue for all to hear.

"Now, that's what I said at that point as pertains to some of my views with regard to it. I read again at 5520, starting at Line 16. I said:

"This jury will first address the following question: is there a causal connection between the Wyeth DTP vaccine and encephalopathy?

"Now going to Page 5521, Line 1, I said:

"Now since the substantial issue as defined is for the jury, it follows the resultant issues which flow from affirmative response are also in order—that is to say they are also for the jury. These include the plaintiff's claims of negligence and/or strict liability. Here, again, giving credence to the plaintiff, first as pertains to its negligence claims, the plaintiff states in part that the defendant company which produces the vaccine for the public safety has a high standard of care. This standard includes the requisite to research and test the ultimate safety of its product. The plaintiff says that it is not enough to stand behind minimal FDA standards and rely upon what others may say and somehow contend the serious risk in the use of its product has not been shown. The plaintiff's case says that for this company over the years to say it's not been aware of the prospect, if not the likelihood, that its whole cell vaccine does not somehow cause or contribute to encephalopathy is also nonsense. Their case suggests that this company has a certain duty to explore the prospect, and if affirmative, why? And when ascertain[ed], to do something about it, and to do far more than to present the product in its present state, however effective it may be.

"There is evidence to support the plaintiff's claim. Moreover, the plaintiff's evidence supports the argument that through the years this company has not expended ten cents of its own assets in such a quest. Now whether such a failure is found and then found to be causative is for the jury.

"Next the plaintiff's evidence suggests more than a few innovative timely procedures, thrust of which, even in its present form, can reduce the likelihood of serious adverse consequences. Lots, like patients, differ. There are hot lots. Lot 66701 is such a hot lot. It is from this lot that the plaintiff's vaccine was drawn. It has been known for years the mouse toxicity test doesn't measure the levels of endotoxin. Also been known by the defendant that the toxic effect of its own vaccine is due to the high level of its endotoxin. Notwithstanding all that I heard, memo eleven and twelve of Dr. Bernstein says that. The defendant's annual report, Exhibit 59, offered early on by the plaintiff, even seemed to suggest defendant's concern as to whether encephalopathies are obscured.

"We heard about the LAL test known by defendant since at least 1975, if not before. We hear evidence of skin tests for hypersensitivity. Those found in India. We heard suggestions of the taking of electroencephalographic readings before and after innoculation [sic] of children. That makes sense, and seems to me deserving of review. We hear the suggestion of autopsies, certainly on some control basis, of the brains of mice to ascertain if indeed endotoxins will indeed disrupt the tissues of some animals, or perhaps, with the consent of parents, of some deceased children, autopsies of those children who have died following the injection.

"Now, at Page 5524, Line 22 I also said:

"Next, notwithstanding explanations tendered by defendant's witnesses, the plaintiffs claim that long before the plaintiff's injury this defendant company was in a position to develop the safer vaccine. Here the answer seems to be an acellular vaccine, thrust of which retains the product's potency and safety. Momentarily we learn that the whole world will await the advent of the Japanese breakthrough in three or so more years. I recall Dr. Bogash: [']You know these Japanese once they set their mind to it,['] he said. But what of the defendant's efforts and their wherewithal? What of Project 77A, Exhibit 49, abandoned. Promise of the Tint patient [sic] or Dr. Long's research, notwithstanding its promise, abandoned, or the success of the Lilly Tri–Solgen vaccine, by the defendant's own admission, a better and safer and more prestigious product. Reports of adverse effects are reduced ninety plus percent. A vaccine sought out by physicians two to one over the defendant's product. In 1974, this company, the defendant Wyeth, owned Lilly's patent rights, the rights to process, which is to say, how to make it and the

license to immediately go on the market as Tri–Solgen, a product of Wyeth Lab.

"To this the defendant says: 'But we somehow just couldn't make it, just couldn't replicate it. The strains are different. The media is not the same. Given our process, FDA won't license it,['] and, of course, given the circumstances, they should not, nor did they. This jury, however, also knows that production of the Lilly product is four times the cost of production of the Wyeth vaccine, the difference of about twenty cents to eighty cents to produce. Now at that time, 1974 or thereabouts, they owned both vaccine. As I read Dr. Bogash—and that is for the jury—he seems to say, 'Just doesn't make good business sense to pursue Lilly. After all, the whole cell vaccine is in compliance. Makes good sense to leave it where it lies, a dead product, and proceed with its own, surely then in greater quantums as there is no place for the physician to go.' The sales increase in this evidence is that from 1976 to 1980, Wyeth was on the rise. If such an analysis is thought unfair, I simply say and I said then, [']Tell that to the jury as they have heard it all.['] For my part I remain at a loss to follow the defenses on this score.

"Next the defendant's warnings to the physician and as contained within the insert are claimed to be inadequate. The thrust of this argument is that given the significance of the presence of endotoxin, its quantum, and the fact that each may vary, the hypersensitivity of some patients ought to be of interest, the causative effect that may, if not probably, result of its consequence, all of this would be of interest to any physician to be so apprized [sic], particularly if he or she has a choice of the product, which in the 70's they did, and for the purpose of enhancing the physician's own alert and information, particularly as to the histories of each child and his follow-up should any complications arise.

"Now this is my analysis of the plaintiff's claim on the inadequacy of warning. To this the defendants say that their warnings state incidence between the product's use and all forms of serious reactions and that they have been reported, however rare; that the defendant's warning is within FDA guidelines and so approved. It claims immunity as to its consequences. This is claimed as if there is a relationship between an association with the use of the product and causative effect from its use. As Dr. Bierly noted an association is when two events occur temporally and/or are next to each other but what he doesn't say is that there's no way in God's world that one can be injured from an association, and everyone in this room knows it and I trust by now that will include the jury tomorrow at 1:00 o'clock. Indeed if the first question of this jury's question is answered in the affirmative, it will be because the plaintiff's evidence is accepted and the presence of endotoxins, its quantum, unpredictable quantum, does play a role in permanent injury to children. In such an event of that finding, they can surely find the present form of the defendant's warnings are inadequate.

"Now, having extended the foregoing comment and findings, it follows as well that if the causative relation is answered in the affirmative, the claims on strict liability are also for the jury. It's clear the claims that the defendant's product was unreasonably dangerous flow in several ways. The plaintiff's evidence with regard to the presence and significance of endotoxins and its unpredictable quantums has been reviewed, as has the plaintiff's evidence as pertains to the vaccine and the causative effect, including children who may be predisposed or vulnerable and wherein the vaccine may result in cerebral injury. The defendant's alleged failure or unwillingness to toxiod its vaccines relate to design defect. Additionally, the defendant's warnings in their present state, if believed, pertain to design defect, and those issues are for the jury.

"I took care at the time of that recitation of findings—as I ruled on the defendant's motion, I believe I addressed the unavoidably unsafe issue and will not repeat it here. I don't know if I could say anything that could improve upon what I said at that

time. I did address the defense with regard to the fact of its claim that somehow the stroke preceded the shot. I said at Page 5534:

"... and to this defendant has also claimed the whole event precedes the shot. This child suffers unexplained stroke, probably within the second month or earlier. It's claimed some satisfaction for having ordered the CAT scan and now read its significant findings as to the CAT scan itself, which was again helpful to confirm the diagnosis of Dr. Gilmartin and the existence of the stroke, but it doesn't change a thing. For what it's worth, as I listened to the defendant's boasting for having called up the CAT scan, and, as an aside, I wonder if in addition to EEG findings following seizure activity, as proposed by the plaintiffs' witnesses, if routine CAT scans of those children reported as encephalopathies wouldn't be of interest if in time a host of cases are shown to be encephalopathy by reason of stroke. It is just a little thing. But seemed to me as well if Wyeth can't do autopsies, maybe they would CAT scan the mice.

"The defendant first called a radiologist to confirm the stroke and to find the pathology which was admissible. He's then called upon to extend his expertise, as if a neurologist, to discuss relevant signs and symptoms and to consider the history and to advise the jury as to the timeliness of the stroke, convinced that by any standard that physician's expertise must be limited and not inclusive of that which I would require. When the plaintiff's counsel finally objected, I struck that testimony as to the latter.

"Next Dr. Guggenheim was called. Somewhat akin to Dr. Hewlett's, the jury awaits her as her testimony on this score—that is, the timing is of significance, at least says the defendant. As of that time, my attention turned to what ought to be required of any person, however qualified, as to assign a time frame for the stroke, certainly if it differs from that of Dr. Gilmartin. Whether it is she or Dr. Gilmartin, [there] are certain physical thumbprints that need to be considered and a requisite level of expertise to reach any opinion. The criteria that I had at hand and prepared in advance of the testimony includes the following: that she would assume the stroke is reflected in the CAT scan; that she would assume encephalopathy as its consequence, which was massive brain damage, and which by its nature gives rise to certain syndromes unmistakable in the hands of specialists. We heard as these injuries manifested themselves, the layman's reminder of the cut wires and how proper that is as one understands the effect of brain injury. Those syndromes include the left hemiplagia and which, in turn, means absent head thrust. I should think any competent specialist would consider the Wesley test taken at the direction of Dr. Gilmartin and found about Exhibit 86, or Number 86 of these records. I doubt if they are in dispute, and they appear to be objective and I should think relevant and which, by example, includes finding of nystagmus not found by Dr. Cibis.

"Of course, the witness's appreciation of the significance of the DTP vaccine itself, if any, together with the witness's appreciation as to the significance of any endotoxin and its quantum I thought to be in order. Who knows? Should an objective expert witness appear and had not been apprized [sic] of the presence or the significance of the shot, and first hears of it from the stand, he or she, like so [many] others who have appeared in this case, directly or indirectly, including Mayo and Johns Hopkins, may well assign significance. Certainly if it is of no importance, the witness ought to be able to say so and why. In every way, the witness's understanding grasp of the subject, in my view, is of import and would have been required.

"Next, the witness needs a fair history of the child, delivery, predelivery, postdelivery. If there is anything untoward, by all means she can raise it. That history, however, will include the fact that Dr. Hertenstein examined the child by way of a full pediatric examination. The child was normal, save for the gaze. What is clear in this case is that this gentleman is

board eligible for pediatric certification. He only writes down abnormal findings. He did write the fixed right gaze. He did do a complete physical examination, save for the eye, and the balance was normal. His complete examination means that he looks at everything, including abdominal sounds, joint mobility, muscle strength, reflexes. He states he examines a lot of complicated reflexes. His examination shows no abnormality other than the eye. He would have noted anything else.

"The tendered witness would also understand that the diagnosis of the eye was that of Cogen's apraxia and no other, and to note that during the course of that examination, according to Dr. Cibis, the child manifested head thrust.

"Now, given the foregoing, which were at least my requisites and awaited the witness's qualification, I saw that the defendant was placed [sic] with a problem, and I was surprised, and perhaps I should not have been, particularly as to Dr. Guggenheim. I was surprised with both sides in this, the history that I defined and would require, was not addressed and the witness's experience with DTP and endotoxin was deleted in its entirety. Here my first surprise came when plaintiff's counsel had no objection to the requested opinion as to timeliness. Only mention this because, again, as I stated later in this case, if the plaintiff had objected, the witness's testimony would probably cease and would have ceased consistent with the rule that I have outlined in this case and mentioned at the outset of these findings.

"There's some irony to this in that the plaintiff's counsel raised the issues that I mentioned in his cross-examination and at which time the defendant complained. This is the same counsel who insisted that before Dr. Gilmartin could ever testify, his opinion as to causation and correctly argued that he must establish his experience and training in the field with regard to DTP vaccine and endotoxin and their effect. I can recall a heated conference at the bench, joined by both defense counsel, to remind me of this importance. As I then recall, and because I agreed,

the defense counsel proceeded with a thorough and exhaustive voir dire examination which extended for a day and a half, and at which time insofar as Dr. Gilmartin's credentials are concerned, they grew even stronger. But, as I said, the absence of even of a mention of them by Guggenheim present no problem to the defense counsel and clearly no problems to Dr. Guggenheim. The weight of her testimony, I said, was for the jury.

"And that left the last witness, Dr. Bodensteiner, and my findings with regard to that witness are in this record and are a part of my considerations with regard to any findings I make here.

"Now, counsel, as I said, I have studied this entire transcript. I believe the entire transcript of my findings on the motion for directed verdict fully address all that is before me here and portions bear mentioning here as they do best state my recall for the state of the evidence and my perception of it and the reasons for my ruling as the matter went to the jury. To be sure there are many more pages of the transcript of that proceeding which bear review, particularly should anyone come to grips with the propriety of the jury's verdict or any rulings made by me. If you will, the entire transcript and review of all of the exhibits is in order for anyone if they are expected to fully understand the complexity of this case and the validity of the jury's verdict.

"The plaintiff's case was articulated by most able trial lawyers who came here fully ready and prepared. The plaintiff met every contention of the defendant and plaintiff's own evidence stood true. I say with every confidence that the jury's verdict must stand and the defendant's motion for judgment notwithstanding the verdict and/or for new trial, because the verdict is not sustained by the weight of the evidence, is overruled.

"**Having said this, I'm also prepared to say now that this fully-tried case says loud and clear that the DTP vaccine can indeed cause encephalopathy and death. I would commend that this most comprehensive record be forwarded for the examination and review not only by defen-**

dant's principals but by responsible representatives of FDA and other esteemed authorities. In my view the likes of Drs. Zahalsky and Geier and Gilmartin ought to be invited to their session and to debate, if you will, the merits of their claims and the evidence, but whoever is involved must have at hand this record. The findings in this case in some way ought to be articulated to every physician in this country who momentarily harbors the defendant's view. Recently, in one of our local journals, a physician has said, 'But jurors aren't qualified to make such findings.' To each who harbor such notion, I can only say, 'Read read this record—all fifty-six hundred pages—examine the documents as this jury did, listen to these witnesses—both sides—and then make your judgment. But never again do so without the benefit of such a complete record or so willingly accept, out of hand, the defendant's claim.'

"I have additionally considered defendant's motion with regard to its claim for newly discovered evidence. Defendant has suggested Dr. Gilmartin's opinion is premised on two or three other cases. Defense counsel made repeated requests for records pertaining to those cases to no avail. Finally, after his testimony, the witness was subpoenaed to produce a record. In lieu thereof, defense counsel received a patient Rodie file. After the trial of this case, they came upon another case and submitted its contents to Dr. Moe, whose opinion is adverse to that of Dr. Gilmartin and confirms the inaccuracy of the Gilmartin opinion. I recall Dr. Gilmartin's testimony and have reviewed the entire transcript of it. He was the treating physician and an expert pediatric neurologist. Among his experiences, he has treated others whom he believed were rendered brain damaged from the DTP vaccine. He recalled at least two or three such patients. Defendant's motion does not indicate nor reveal that prior to Dr. Gilmartin's testimony before the jury counsel had taken two separate discovery depositions of the witness. If requests were made for any records, I was not aware of any, nor were they made here. In this case, Dr. Gilmartin was examined by way of voir dire for a period of

one and a half days. Following his direct examination, wherein he stated his opinion and explained his reason, the cross-examination was also extensive. Dr. Gilmartin was in this courtroom for an entire week's time. At no time in the course of any portion of that case was I ever formally advised or informally advised of defense counsel's plight or any suggestion of prejudice. I was advised that once Gilmartin was excused from the stand, defense counsel had subpoenaed certain records. Dr. Gilmartin was to appear here the next morning immediately preceding the trial. He did not appear, nor did I concern myself with it, assuming that as of then the defense counsel had received whatever records were required. I did surmise that as of that time, should the witness appear, he would probably assert privileged communications and require a waiver from his patient. However, it appears this was unnecessary, I'm told, as counsel for the defendant when Dr. Gilmartin visited at the doctor's office the very evening, he was subpoenaed. My next concern with regard to the production of any such documents by way of subpoena was their relevancy. I would not have been persuaded to permit the defendant at that point in time to proceed with some collateral attack as it might pertain to one of Dr. Gilmartin's patients or his diagnosis. In other words, this jury was not going to hear about someone else's case and its causal connection, if any, should that be the case. Certainly at that time such an attempt, in my view, was irrelevant.

"Lastly, as pertains to defendant's motion at this time, I can only remind counsel that evidence is not newly discovered since it could have been discovered prior to trial. In *Martin versus Martin*, found in [5 Kan. App.2d 670,] 623 P.2d [527 (1981)], or *Conley versus Trobonius* [*Connolly v. Frobenius*] found at [2 Kan.App.2d 18,] 574 P.2d [971 (1978)]—and I will cite the case—such is the rule. Accordingly, I'm prepared to find here that in the first instance the so-called new evidence is merely a conflicting medical opinion not timely sought, and irrelevant here. Additionally, given the focus extended to the preparation for cross-

examination of Dr. Gilmartin, and his cross, no prejudice is shown. In the final analysis, Dr. Gilmartin's experience with other cases was only a small part, if any, of the witness's expertise and the basis for his opinion here, and the defendant's motion for new trial on this ground is overruled." (Bold emphasis added.)

Defendant has added in its brief, under Subheading B, that at the end of plaintiff's case in chief I said:

I will ask you, though, here in 1987, what have you ever done at any time by way of Wyeth to work on that question [a better vaccine]? You haven't spent ten cents to research it or clinical tests to do anything. What have you done? I'm taking the plaintiff's argument.

(Trial Transcript, p. 2326.) This remark is, in fact, recited again in the course of comment at the time I took up arguments on the defendant's motion for directed verdict.

In retrospect, perhaps it would have been better to say, "Given the state of the evidence, it is not shown that this company has expended *any funds* of its own for independent research, to ascertain if its product causes or contributes to encephalopathy."

Stated in such a manner, given the evidence, the statement is also true.

I have no apology, when in the course of arguments, for reciting the nature of a claim and addressing comments from the attorneys if for no other reason than to provoke clarity from the arguments. In this case, the banter between counsel Knopp and me went like this:

MR. KNOPP: So, Judge, the fact is that using the process that we got from Lilly, we made—Wyeth made a honest effort to reproduce that, and did clinical trials on that. It is the Bureau of Biologics that is keeping us from doing that to this very day. They have got their own reasons for it, but there that product is that we could make and we could send out, except they won't let us. Now, trying to circumvent that, the plaintiffs say: Well, you just—what you really did was made that change—in spite of the admission of Zahalsky that the change was made because of the contaminated strain—in spite of that and what they would like the Court to believe, only reason you guys did that is to make more dough. There's just no evidence of that, Your Honor, none. That's all circumstantial really from Zahalsky.

THE COURT: Take you through it, forecast plaintiff's theory: Competitive product out there, ninety percent less toxic or injurious—

MR. KNOPP: Can I address that?

THE COURT: Just a moment. Affecting your business, you now buy it, you don't put it on the market. If you did, it will cost you five times more than what you are presently showing—in other words, twenty percent as opposed to eighty percent or thereabouts. Arguably that is good reason why you didn't put the product on the market.

MR. KNOPP: Fatal flaw, Your Honor.

THE COURT: Maybe.

MR. KNOPP: Fatal flaw: It was already off the market. Lilly went out of the biologics business. It was off. It was fair game. Anybody that wanted to do anything with that could have done it. It was off the market. They had gone out of business. They [had] just withdrawn from the entire biologics field. So, that just doesn't hold water.

THE COURT: Let's see that for the moment. You now have it. You can put it on the market.

MR. KNOPP: Yes.

THE COURT: Cost you five times more to process it than your present product. That is measured in cents when it comes to what it actually costs you to make it.

MR. KNOPP: Dirt cheap. Whole thing, dirt cheap. That cost increase that they are talking about is dirt cheap. You know, I don't think that the law requires this Court to throw away its common sense in ruling.

THE COURT: No, But I'm also aware that I'm not the fact finder.

MR. KNOPP: I understand.

THE COURT: You will ask the jury to use their common sense.

MR. KNOPP: Your Honor, what I'm suggesting is the theory—only theory that plaintiffs have for suggesting that that Lilly-like product was not approved was because that we somehow deliberately sabotaged the whole thing and tried to get it off the market. Now, I assure the Court—it's a theory of Mr. Warshafsky, it's a theory that he voiced here in Court sometime ago and he's been trying to prove ever since he voiced it, but it's not true. No evidence to support that. The increase in cost by using—if we had been able to use the Lilly strain was so—

THE COURT: You were able to use the Lilly strain.

MR. KNOPP: We couldn't because it was contaminated, and that's the evidence, Judge.

MR. WARSHAFSKY: I hate to interrupt but I would say this: Don't you think that as officers of the Court that when you state the evidence, not your interpretations, that we ought to state what the people said, not what we would like to have—

MR. KNOPP: I think what I'm saying—

THE COURT: Let's let Mr. Knopp talk. I recall Dr. Z.

MR. KNOPP: I think that's a fair statement. He said it was dirt cheap.

THE COURT: Go ahead.

MR. KNOPP: Point I'm making, Judge, is to buy something other than what the evidence shows—that is, that there was a contaminated strain as a reason for not doing it simply doesn't hold water at all. There's just no evidence for it. That's why I'm suggesting. That's the only, the only vaccine that was ever licensed in this country, other than the whole cell. Judge, you know, you have got a situation—this is unlike some of the other cases that the Court has been faced with recently, but here we are dealing with a product that the entire civilized world is working on, and, again, if the Lilly process, in fact, was better, what we did—incidentally, this isn't in the record, so I won't talk about it in terms of the agreement with Lilly, but there is nothing that would prohibit

somebody in England, Germany or wherever to make the Lilly-like. Seems to me that you have got the government of this country working on the vaccine, have been working on it, all of the people in this area, all over the world and still we don't have anything better and we are in 1987.

THE COURT: **I will ask you, though, here in 1987, what have you ever done at any time by way of Wyeth to work on that question? You haven't spent ten cents to research it or clinical tests to do anything. What have you done? I'm taking the plaintiff's argument.**

MR. KNOPP: I understand.

THE COURT: What you have you done?

MR. KNOPP: Your Honor, do you recall Dr. Zahalsky's testimony about how many people would be required in this country for an appropriate clinical test on a new product. Do you remember millions?

THE COURT: Only to say you didn't. You have done no tests.

MR. KNOPP: Not true. No. No. We did do clinical tests of the Lilly-like. They haven't proven that we didn't, nothing in evidence yet.

THE COURT: All right. I'm just picking at you.

MR. KNOPP: I'm getting instructions from headquarters. Take a moment.

THE COURT: I get those too.

(Trial Transcript, pp. 2322–27 (bold emphasis added).)

In sum, I am at a complete loss to ascertain any sense of hostility here. There was none then, nor is there now.

Given the whole of things, and understanding that at the time of my comments, the evidence in, and the verdict in, the court has no apologies for any comments made; I said what I thought needed to be said given the state of the case. Not one word of it can be construed as a statement of bias or hostility; every word is geared to the evidence as I saw it.

*The Dark Side Commentary*

At the time of our latest hearing, I inquired of counsel Knopp if he desired to add any *other* claims of bias or hostility. He obliged me by reciting additional material; each, save one, was already embodied in his motion. Mr. Knopp did mention, however, the remarks I extended to counsel and the corporate representative at the close of my findings on the defendant's second motion for directed verdict. The sum total of what I said is already reported in this opinion but some of it bears repeating here.

Now I review this for several reasons: If you will, as to the substantive issue which I have discussed at first, the defense appears to proceed on two levels: First, aggressive, intelligent, substantive one and which matches the plaintiffs' case as if blow by blow, from a trial Court's view, a joy to officiate, a fair fight and the makings of what I see to be a great trial. **But there's another side to the defense, and particularly as might pertain to the second issue I have just addressed, in my view a darker side akin to a wrecking crew or a hatchet man:** Admit nothing, deny everything, create havoc, raise doubt, perhaps provoke trial error, all the while play the martyr, make a full record, proffer, proffer, proffer as if this case is being tried to the Circuit panel and a jury trial is only some hurdle it must first pass. If you will, the rests [sic] of this is the prejudicial effect it probably has upon this jury. That's not my problem, but it is a disappointment and deserving of mention.

(Trial Transcript, p. 5532–33 (bold emphasis added).)

I must say that I find counsel's complaint here to be most odd. The subject matter is addressed in several parts of my findings and comments. I should think counsel Knopp would prefer to hold these events "to his breast." Now, however, since he has raised my remarks for a basis of bias and hostility, I am required to respond and explain. I will do so in this instance, for sure, as if the president of Wyeth were listening.

First, counsel Knopp and Herrington have proceeded here as if they were in a "platoon" system. Their separate roles were explained to me at the time of our in limine conference preceding trial. As I understood it, Knopp was here to defend Wyeth, i.e., to cross-exam the plaintiffs' key witnesses and present Wyeth's defense. He called most of the defendant's key witnesses. Herrington was here to collaterally address plaintiffs' case. Both counsel, over objection by plaintiffs' counsel, were permitted separate opening statements and closing arguments.

The first reason for my comments here came to light in the course of Mr. Herrington's cross-examination of Mrs. Graham. (Trial Transcript, Vols. 16–18.) This process was extensive. Mr. Herrington's mode of practice is to "bore in" in a confident way, and in the interest of extracting affirmative responses and admissions. There is certainly nothing wrong with this. The problem here, as I saw it, was the subject matter with which he dealt. None of it seemed to have any real application or relevance, given what I had been told; counsel knew this. The plaintiffs did not know this.

By example, we dealt with such things as the events taken up at the time of the child's shot, the parents' release, etc. We heard much of apraxia, which at that time was represented to me as a congenital anomoly. The child fell from a couch and this event suggested some form of concussion—maybe brain damage. There was absolutely no evidence to support such conjecture and no physician supported it. The plaintiffs didn't know this. At the time of birth, the child's navel was inflamed, and she was born with a mild form of jaundice. Again, none of this was relevant, and counsel knew it. The plaintiffs didn't.

Throughout the course of this, the plaintiff mother tried to explain herself. All the while, counsel bored in. Yes, since the time of the child's shot, she had encountered difficult problems, commencing with her temperature. It was true, she did not equate this condition to the shot; she simply knew that since the shot the problems

had arisen. She did seek all sorts of care. She consulted osteopaths, chiropractors, acupuncture, and even a faith healer. This simple, honest and loving mother tried to explain herself. She was even questioned as to whether she took care of her own nutrition during her pregnancy. Defendant's counsel even stressed that she is, after all, on welfare.

Somehow, counsel, ignoring the glare of the jury, believed this mode of confrontation was impressing someone. In the course of events, the plaintiff mother broke into tears and required a recess to compose herself. From what I perceived, this jury needed a recess. In my view, this moment was awkward and painful. If the president of Wyeth had been here, he most certainly would have put a stop to it. To be sure, I had no apologies for expressing my view to those in attendance on the eve of instructions and arguments. For me, it was as if to say, "It's not for me to tell you how to try your lawsuit. Indeed you can lose it all by yourself."

Next, an incident surfaced in the course of cross-examination of another plaintiffs' witness. (Trial Transcript, pp. 4360–74.) Counsel was under way with his cross. In addition to the mode I have described, counsel had at least two problems: when on a roll, as he was in this instance, counsel does not take well to interruptions—particularly objections—and more particularly when objections are sustained. When objections are made and sustained, rather than readily complying, counsel resists, mumbling to himself. He discusses it with himself, as if no one is listening, literally reasoning aloud why the question is a good one and that the court is wrong. He then decides to ask the same question again. An objection is again lodged and sustained. At that time, the process starts over. This awkward practice prompted a warning but it did not hold for long. In this case, counsel proceeded again precisely as described here, and this time I gaveled him down. This was the first time since coming to the bench that I ever held the gavel in my hand. I brought counsel to the bench to make him understand that such conduct would not be tolerated. I meant every word of it and mean it now. No judge or jury needs to suffer such behavior.

My admonition held for a spell, up to the last witness, Dr. Bodensteiner. (Trial Transcript, pp. 5330–5413.) A very serious situation occurred here, which, for the most part, prompted my comments complained of now.

As recited in my findings, Dr. Bodensteiner was here for a particular purpose. There was an objection by plaintiffs' counsel as to the cumulative nature of his testimony. For pragmatic reasons, he was the last witness; I understood he had been here for a day and the next day we would be under way with jury instructions. I took the plaintiffs' motion under advisement, at least until I heard his direct testimony. In very short order, defendant's counsel was addressing an area beyond the reasons for which the witness was called. I permitted plaintiff counsel to voir dire the witness and Mr. Warshafsky was ready for that moment.

In the course of only two questions, Mr. Warshafsky established that notwithstanding the witness' insistence that he had become an expert only since sitting in on Dr. Hewlett's testimony the previous day, within the recent past in another case, the witness' deposition recited that he possessed *no* expertise in this field. In that same proceeding, the witness volunteered that in his view Wyeth's product will cause brain damage. I informally discussed this matter with counsel and equated the event to that of the Lewis/Schmelling fight. Schmelling was down and out in the early moments of the first round. So was Bodensteiner! As indicated in my remarks from the bench, counsel was well advised to assist this poor man from the courtroom and express his regrets to the jury. This was not to be the case. Instead, counsel elected to literally resurrect the man. During the next 30 minutes or so, counsel put to the witness a host of questions; each one was objected to, and each one was sustained. The procedure occurred again and again and again. Most of the questions were simply recitations of what had already been asked and objected to and

sustained. Counsel was not deterred. He mumbled aloud, reasoning for everyone to hear, that the court was clearly wrong.

As any trial judge knows, we have a vantage point the lawyers do not share. I look directly into the faces of the jury. In this case, I saw fury. The lady who ultimately served as the foreperson looked up at me as if to say, "Why don't you stop this?" Indeed, I probably should have, for I promised counsel that I would. I did not, however, for the simple reason that I extended to him all the rope he needed. There is no question in my mind that this lawyer's conduct contributed to utterly destroying not only his own credibility but that of counsel Knopp, and most importantly, that of Wyeth.

I shared this view with the lawyers and the corporate representative in attendance in a straightforward way, and I have no apology for doing so. While on this subject, there is one additional piece of information which would corroborate the views of the court.

Shortly following trial, I was requested by Wyeth's counsel, Debra Arnett, to authorize a professional query of the jury. In other words, some professional service would interview each juror. I consented with the reservation that I be privy to the questions. I did this. The questions were such that upon completion Wyeth must know all that it will ever know, or need to know, as to the jury's view of the case. The questions addressed plaintiffs' case, the witnesses, and the lawyers. They similarly addressed the defendant's side, and I am ever certain some of these findings inform Wyeth fully as to why it lost the case, and none of it will have to do with anything this judge said or didn't say in the course of the proceedings.

### Trade Secrets

The defendant next complains that I lost my objectivity by deciding that no trade secrets were included in the Wyeth documents and by putting in place a "Wyeth Laboratory DTP Vaccine Litigation Discovery Library." I appreciate defense counsel's displeasure with my actions. Wyeth addressed this decision by mandamus and I was reversed. I am at a loss,

however, to understand why my decision gives rise to any sense of hostility or bias.

I took such action at the time I addressed plaintiff's motion to set aside a protective order which had been in place from the outset of this case. Massive documents had been accumulated and produced to plaintiffs, and plaintiffs' counsel, following through, sought a license to prevail upon some of that accumulation in preparing for other Wyeth cases. Defendant wanted all of the documents returned. Probably to the surprise of both, at the time of hearing I put in place what I called a library, in that I impounded all of the documents. (Dkt. No. 170.) I innovated here because I was certain that following full trial of such a complex case, for the benefit of other judges or trial lawyers, much of the material should be available in the interest of avoiding unnecessary discovery, expense and time. I make no apologies for this innovation and readily accept the mandate of the circuit. In sum, there are simply no rules or codes that provide for this, up to this moment in time. I was in error.

In the course of those proceedings, however, it was not my intention to impound trade secrets or privileged documents. Mr. Knopp, defendant's counsel, was asked if any of said contents contained any part of these kinds of information. His answer was negative. He was not in the position to identify any; even so, my order excluded the production of such documents. However, I did find in this case that no trade secrets were made available in the case or within the confines of any of the documents. I repeat here that there are no trade secrets, and I am at a loss to understand defendant's present complaint.

### AMA Panel Report and the Court's Comments

Defendant further complains that I had already made up my mind and lost my impartiality on ultimate trial issues when I permitted the admissibility of the AMA panel report entitled "Pertussis Vaccine Injury." (Pltfs.' Ex. 376.) Defendant is disturbed by the fact that, at the bench, I recited the following:

The findings made by the panel are, in my view, the smoking gun we have been looking for, aren't they?

(Trial Transcript, p. 1627.)

Admissibility of this exhibit is one of the reasons the circuit court assessed trial error at my hands.

Even before addressing my statement, and ever sensitive to the circuit's mandate, I have expressed some disappointment with this ruling, given my understanding of what was before me then. The circuit concluded that I erroneously entered into evidence a document which was neither a scientific or clinical study nor a learned treatise. Moreover, since a copy of the exhibit was handed to each juror, I violated Fed.R. Evid. 803(18). Of course, I accept the circuit's ruling, but because the defendant puts this in a context of bias as if I am trying a case oblivious to the rules, some explanation is in order.

I have innovated in handing to the jurors copies of key exhibits ever since the trial of *O'Gilvie v. International Playtex*, 609 F.Supp. 817 (D.Kan.1985), *aff'd in part & rev'd in part*, 821 F.2d 1438 (10th Cir. 1987), *cert. denied* 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d 601 (1988). I also encourage the jurors to keep notes while listening to the witnesses. I have interpreted Rule 803(18) to mean that the text itself need not be given to the jury, nor should it go to the jury room, but it has always seemed to me that copies and excerpts taken from these texts, in each juror's hands, are helpful in the learning process. It seems to me that it is far better than the practice typically engaged in by trial lawyers with the use of overlays and screens. In cases such as *O'Gilvie*, the medical treatises, the FDA records, disease studies, etc. went to each juror. I have engaged this technique regularly since that time. I am told that in *O'Gilvie*, where the defendant counsel did object to the process and was overruled, the issue was squarely addressed by the Tenth Circuit. That case was every bit as complex and lively as was this one. While not addressed in the circuit opinion, every trial ruling was sustained. I have since assumed that my practice has at least been acquiesced in. I was incorrect.

In this matter, during the in limine hearing (p. 27), I reviewed with the lawyers my practices, including that recited above. I called for objections; there were none. Defense counsel availed himself readily of this practice, and he privately acknowledged to me that it was quite helpful in having the jury understand the case.

Next, the circuit found that I committed trial error in permitting this exhibit when it was not shown to be an authoritative treatise. My reasons for my ruling on the admissibility of the exhibit had nothing to do with the rule. While not stated, it had everything to do with Fed.R.Evid. 613. The document was offered as a report from the American Medical Association for *impeachment* purposes, and in my view it was done so in a classic way. The exhibit dealt with a statement joined by Dr. Edward A. Mortimer, of Case Western Reserve University. Exhibit 376 recites as follows:

It was the opinion of the panel that the probability of encephalopathy being considered a *possible* adverse reaction to pertussis vaccine is 100%. In any specific case of encephalopathy related to vaccine administration, there is about a 60% to 70% level of probability of vaccine causation; about one in three may have residual brain damage after one year.

Dr. Mortimer and his work were embellished by defense counsel in *opening statements*. (Trial Transcript, p. 145.) At that time, Mr. Knopp took great care to have the jury understand that Wyeth's position in the case stands foursquare with the world health circles, the FDA, the bureau of biologics, and a host of physicians, including Dr. Mortimer.

In plaintiffs' case in chief, Dr. Gilmartin, a local neurological pediatrician, was presented Exhibit 376. At this point, Mr. Knopp became quite exercised. He was doubtless surprised and embarrassed. He came to the bench with a laundry list of objections as to why the document should not be admitted. I am one who happens to enjoy a good lawsuit, well tried by good lawyers. Mr. Warshafsky had scored, and I was amused. When Mr. Knopp came to

the bench, and in the course of his objections, with a smile on my face from ear to ear—tongue in cheek—I made the statement pertaining to a smoking gun. Of course, this exhibit is no smoking gun. It did, however, strike me as one of the best modes of impeachment I had experienced. To be sure, we heard no more of Dr. Mortimer or even some of the other witnesses on whom the defense was relying, i.e., Dr. Cherry.

### Drs. Cibis, Breckbill and Deitch

The defendant complains of my lack of impartiality for excluding the testimony of Drs. Cibis, Breckbill and Deitch. Defendant complains in particular as to my ruling that "[t]he minute the person says: I have no appreciation of endotoxins or their significance or effects, if any, the witness isn't going to testify." (Trial Transcript, p. 4586.)

Again, the circuit addressed this ruling and I was found to be in error. I am at a loss to understand why the ruling denotes partiality or hostility. Because the context of the defendant's assertions additionally suggests some obstinacy on my part as to the admissibility of witnesses such as these, some explanation is in order.

For some time I have held the view that in complex, scientific cases it is important that we have on the table the necessary scientific facts the witness is relying on. I addressed this view fully in *Johnston v. United States*, 597 F.Supp. 374 (D.Kan. 1984). In sum, I said there that some experts are willing to say things to juries which they wouldn't dare say to their peers. Here, we deal with a claim which suggests that the presence of endotoxins in the DTP vaccine will give rise to disruption of the vascular tissue, including the midbrain. Plaintiffs' case supports this thesis and does not need to be repeated. It was my view that medical experts who are tendered to assert opinions on the cause of the plaintiff's condition ought to know something about the DTP vaccine and the effects of endotoxins.

I shared this view with the attorneys in the course of our in limine conference. Each of them had read *Johnston* and understood my views. I encouraged the lawyers to dig deep; I suggested that when substantive opinions are tendered, that expert ought to be carefully examined on voir dire in the quest for the factual foundation to support his opinion. I read the circuit opinion to suggest that these are probably matters of credibility rather than factual foundation. By example, Dr. Cibis was perceived here as an opthalmologist who claims to be able to read CAT scans. This may be so; however, I have doubts as to whether he is certified by any hospital or any neurosurgeon to express his views to them. In this case, he has expressed an opinion from the outset that he is without credentials to recite opinions of causation. When presented with a CAT scan, however, he is prepared to say that the child's condition (massive brain damage) was caused in utero.

Actually, there was more to my ruling on Cibis, which in substance was as follows. This gentleman examined Michelle Graham at age 2½ months shortly prior to her receipt of the DTP vaccine. He was referred by Dr. Hertenstein, the family physician. Dr. Hertenstein's testimony reflected normal neurological reflexes, i.e., no abnormalities. On receipt of the patient, Dr. Cibis examined her and his records are silent. While my trial notes reflect that he concluded the child had been "neurologically normal," in actuality, his records simply denote "no abnormality". His records are silent on this score. At that point in time I found it incredulous that this witness was so willing to testify. He has held the child for the purpose of examination, and the child, at that time, must have manifested all of her signs and symptoms including the absence of reflexes and spasticity. The child cannot control her left limbs, her neck, or her head. In my view, there was no reasonable way this physician could ignore these findings if they were there to be seen. While I retain this view, the circuit court has ruled.

Dr. Cibis was also presented to assert that the child's condition of Cogen's apraxia, the absence of fixation movement, confirms his diagnosis. In all probability, I was confused on this, relying from the outset on representations of defense coun-

sel, commencing in the in limine hearing, opening statements, and statements to me, that this condition is congenital and not necessarily related as a neurologic manifestation of the stroke. Any misperception by me as to the state of this case, as Dr. Cibis was presented the second time, is regretted, but surely none of it was decided on the strength of bias or hostility.

There is an additional reason addressed in part during the course of my rulings which needs to be noted here, as the defense challenges my bias. Throughout the course of plaintiffs' case, counsel Knopp was as concerned as I that before the plaintiffs' medical witnesses could ever address a view pertaining to pertussis encephalopathy, the witnesses must be shown to have identified their experience with endotoxins. (Trial Transcript, pp. 1345–1522.) Mr. Knopp extended repeated objections, and he was permitted an extensive voir dire of Dr. Gilmartin on this score. As the record indicates, Dr. Gilmartin was shown to be amply qualified in this field and he was permitted to testify.

Additionally, my reasons for limiting the testimony of certain defense witnesses came in part because I awaited Dr. James Cherry of California. This gentleman was represented by Mr. Knopp as the defendant's key medical witness who would respond to the plaintiffs' claims. I took some care to assist Mr. Knopp with scheduling this witness' testimony. For whatever reasons—never announced—Dr. Cherry was never called.

### The Pulitzer Prize Comment

The defendant, in a footnote, makes reference to a statement made by me with regard to prospective witnesses who had not yet testified:

My personal view that either one of them could come in here tomorrow and say they have just won the Pulitzer Prize for their discoveries in endotoxin or in their field of pediatric neurology and could tell the jury that they walked across the Pacific Ocean to get here and

wouldn't make any difference to this jury.
(Trial Transcript, p. 4584.)

I recall this statement; in sum, it followed my ruling pertaining to the admissibility of Dr. Pollock, an eminent epidemiologist from London and a member of the Royal College of Physicians, who was here to state his views. This gentleman had conducted a study of foreign vaccines, not including Wyeth's DTP vaccine. With no showing that the same are similar, I struck his testimony. In saying this, consistent with the circuit's opinion, I anticipate this witness returning to the stand.

I made my comments drawing on a humorous remark extended by Professor Irving Younger at a judges' seminar on the subject of evidence and hearsay, where he remarked in substance that, "I don't care if the Queen of England has said this. She may have placed her imprimatur in wax on a gold seal—it's still hearsay!"

As indicated, drawing from that experience, I extended my own comment from the bench, smiling throughout, and I meant it.

### Dr. Geier

Defendant complains of my December, 1988 ruling, at the time I took up its second motion for relief from judgment. I said that "Wyeth's posture today on the motion is misplaced, unfounded, and unfair."

Again, and to avoid some suggestion that I am obstinate in my views and because I recall the proceeding, some explanation is in order. Mr. Knopp came to chambers for the purpose of this argument. Unbeknownst to the attorneys, I had my secretary arrange for Dr. Geier to stand by for a telephone deposition, at which time he could explain his error.

I opened this proceeding as follows:

THE COURT: This is Judge Kelly in Wichita. How are you, sir?

DR. GEIER: Doing well. How are you doing?

THE COURT: I will ask you if you would speak up a little bit. I have got you on a conference call here and I want everyone to be able to her [sic] you.

DR. GEIER: Try to do so.

THE COURT: I think you recall you testified here in Wichita in the Graham versus Wyeth case?

A Yes.

THE COURT: And you testified for the plaintiff in that case. Since that time, the defendants in this case have challenged your testimony. If I were to summarize the substance of it, it is to suggest some misrepresentation at your hands as pertains to your ultimate opinions. You misrepresented here to the jury the number of tests you had performed and the results of those tests, and that you withheld from Wyeth the results of your endotoxin testing of the Japanese acellular vaccine.

Now, that, in effect, is the thrust of their claim here; do you understand that?

DR. GEIER: I understand. I have heard a little bit about it.

THE COURT: By that, they have tendered to me the excerpts of your testimony here, as have the plaintiffs, and I'm told that since this case you have testified in other cases and apparently have agreed that one of your preliminary tests wherein you concluded two hundred and forty micrograms per millilitre was misplaced in that it should have been twenty-four; do you recall that?

DR. GEIER: That is correct. It was a decimal point error.

THE COURT: Remind you, Doctor, when you came here to testify, you were under oath, and for the purposes of my query and that of the lawyers, you're still under oath. All right?

DR. GEIER: Yes.

BY THE COURT:

Q Will you explain to me the significance, if any, of whatever miscalculations you made, how it happened and what it means, please?

. . . .

BY THE COURT:

Q Go ahead and start from the beginning, if you will.

A Okay. There was a mathematical error which occurred on test four. If you look at test four, you easily see how on [sic] it occurred. Do you have test four in front of you?

Q I think so, yes, sir.

A If you look at two fifteen where it says zero point one nanograms per mil.

Q Yes, sir.

A FLPS standards, two sixteen on the original, where the error was, said zero point eight nanograms per ml. All right. Should have said zero point zero eight nanograms per ml. Likewise, two seventeen should have said zero point zero six, and eighteen should have said zero point zero four. It's a fact that any scientists can see that sixteen could not be zero point eight because all of the dilutions are descending. Point eight is greater than point one. As you do dilutions, you do not get greater. It was a decimal error that occurred there, which was discovered at the end of October or perhaps early November of the year after the trial, which does influence the correct level of endotoxin in the vaccine; however, it has no bearing whatsoever on my opinion in the case because, if you recall from my testimony, I testified that I did not know the significance of the absolute value of the number; that I was doing a comparison; that error occurred in every vaccine that I tested, so the comparison between the vaccine does not change, ten-fold error in Connaught, Lederle, in the Japanese and everything. As I did not know the absolute value, it does not influence my opinion whatsoever, and, in fact, I have heard a little bit about what the defense has been saying in this. The implication is if I were to testify today with the correct numbers that I would testify much more weakly against Wyeth. Actually the reverse is true. If you will look at my testimony, I pointed out that my tests at the time were very preliminary and that I would not even allow plaintiff's attorney to say that Wyeth was higher than Lederle to say that I don't think you can say that on the basis of the little bit of testing I have done. I have done much more extensive testing and it's very clear that the Wyeth vaccine is by far the worst, based not only [on] my own testing but test results

that I have obtained from them. It's not true to say that that would have weakened my opinion. It is true that there was—there was a calculation error. There was certainly no intent on my part to withhold any information. That was an error which I made, which actually, had they looked at test two, they would have known that that was an error. Test two is correct but test four is incorrect, and any scientist looking at this could have been able to tell that that error was made. But, as I said, it's a—to me at least a very minor point because I had testified that I had no idea what the absolute values meant. Incidentally, now, I do have some repeat because I have read some recent paper by Dr. Sheldon Wolf who has tried endotoxin on volunteers and he has found that from two to four nanograms per kilogram cause a significant fever and significant effect, and now I can calculate that the vaccine contains at least five hundred times more endotoxin than you need to get a significant effect on normal volunteers, but at the time of this trial, I had no idea what a significant amount of endotoxin was, and I stated that in my testimony.

Q In connection with your testimony, did you need that study anyway to draw your ultimate opinions?

A My study?

Q Yes, sir.

A **No, my study played a very minor role.** I brought it because each defense attorney always said anything that influences your opinion at all has to be brought. This is with the very early forecast study, in a study that was going to have hundreds of tests, but I thought it was only honest to bring what little results I had on their insistence. However, certainly I'm not the first one to have measured endotoxin and really had little or no influence on my opinion at that time. It's developing now, but I stated in my testimony that I was not weighting that at all because I considered the tests to have been very preliminary and only brought them because basically I was told: "Anything that you

have that influences your opinion, you have to bring."

Q Other question had to do with a suggestion that you withheld results of your testing of the Japanese cellular vaccine.

A I don't understand that criticism at all—that is, why would I withhold testing the Japanese vaccine, which has somewhere between—I calculated now—sixteen hundred to four thousand fold less endotoxin than Wyeth. Are they trying to imply that that makes them look good? I think it makes them look terrible. I have completed much work on the Japanese and I now know that their vaccine contains somewhere between a thousand and four thousand fold more endotoxin. Had I wanted to make Wyeth look worse—not what I was trying to do at all—I would have not withheld the Japanese, I would have brought it. It would make it look worse. I don't understand how they can think that I withheld the Japanese information.

Q Dr. Geier, your comments here have been helpful to me, but I will ask Mr. Knopp, do you have any questions of Doctor?

MR. KNOPP: Yes, I do.

(Transcript of Motions Proceeding 12/12/88, pp. 46–52 (bold emphasis added).)

The witness responded fully to each question put, but has changed nothing insofar as his response given to me.

The circuit panel, while most precise in its ruling, overlooked or was not provided all that this witness had to say. In sum, he said that while he was in error in his calculations, the same are irrelevant to his ultimate conclusion. Indeed, it was on the strength of this testimony that I believed it advisable not to order a full new trial. I was then convinced that my judgment was discretionary; today I am aware that I am in error. Even so, there is nothing in my ruling or reasoning which suggests hostility on my part, nor in my view, do the remarks extended by defense counsel suggest same. While counsel attached a part of what I said, I extend all that I believe is relevant:

THE COURT: Doctor, I appreciate very much your time.

A   I hope I have cleared it up a bit.

THE COURT: I think you have. Thank you very much. All right.

Well, I think if there [are] any misgivings about having Dr. Geier stand[ ]by, all counsel should know this was on my initiative, in that I put it in place and I did it last Friday in that my secretary made the contact to locate Dr. Geier and to ask him to stand[ ]by. As I indicated before we took it up, I thought it was in the interest of clarification because I was ever certain that notwithstanding my own review of the transcripts and the depositions and all that is contained in these massive addendums, I was satisfied that Dr. Geier was prepared to say and did say that notwithstanding miscalculations in the preliminary test, it is wholly irrelevant insofar as the significance of his findings, and understanding that, as I do, I'm certain all of us who now having heard the witness, there is no reason in any[ ]way why I should dare suggest that his testimony has prejudiced the defendants, nor has he misrepresented anything to anyone, nor has he committed misconduct as an expert witness in this case.

Now, I'm prepared to proceed on with Dr. Zahalsky, but I think this witness addressed Dr. Zahalsky, as have I in reading the testimony. [It] [m]ay be in the course of his testimony some suggestion was made that his relationship with Dr. Geier was more collegial than perhaps it actually was, but he did testify that he had read his work, was familiar with him, regarded him highly, and had communicated with him. I think it's been clarified since the trial that his communication was by telephone, as opposed to some kind of a joint study or something of that character that was never stated by Dr. Zahalsky.

So far as Dr. Gilmartin is concerned, I have read his testimony and that which has been raised as to his testimony and I'm satisfied it is totally misplaced and I needn't review it further for the purposes of the decision.

Having said that, the motion for relief from the judgment—that's the second motion—is overruled in its entirety. Dr. Geier's own testimony squarely disclaims any suggestions made by the defendant that his testimony was misrepresented or misplaced or that the defendants were in any[ ]way prejudiced by what he acknowledged later to be a miscalculation. It changes nothing insofar as the ultimate opinion is concerned.

I have addressed Dr. Zahalsky and Dr. Gilmartin. I think the only thing I can say further that if it is the intent of the defendants to raise these issues as well to the Tenth Circuit, I trust that panel will do what I have done—that is, to read the entire record, as I have been required to do again, and I trust to read and hear Dr. Geier's testimony taken today, because in fairness to all parties, and me included, only way to draw conclusions from the testimony is to do just that. I believe anything less than that is not to address the requisites necessary to reach decision, and I'm also satisfied that in doing so, any person who reviews the record will agree with me **that Wyeth's posture today on the motion is misplaced, unfounded and unfair.** Now, having said that, that motion is overruled.

As to both of the motions, with regard to the protective order and this now with regard to the second motion for judgment, they will be reduced to a very brief memorandum and reference made to the record that's been taken today. I think it's the best way I know to permit anyone to understand what has transpired here today and why. Okay?

(Transcript of Motions Proceeding 12/12/88, pp. 73–75.)

*Dr. Hewlett*

The defendant's complaint is with regard to my criticism and belittlement of one of Wyeth's experts, Dr. Hewlett. The criticism occurred when the witness asked if he had said something wrong because an objection was sustained. I responded, "Simply said, you didn't know what you were talking about."

Standing alone, stripped of context, such statement sounds sarcastic and even injudicious. This was not the case nor did I intend to recite it in that vein. I recall the witness' testimony; he had been on the stand for a day's time. There were many objections and he remained goodnatured throughout the course of his testimony. He was an effective witness. The testimony reaching the point of my comment was as follows:

Q [By Mr. Knopp] Doctor, one last thing: When you were being asked to respond to isolated bits and tidbits out of all of those textbooks, you had a comment to make dealing with the application of those textbooks to what is before this jury. I think you indicated something to the effect that this jury is getting stuff that is much more current than some of the things being pointed out and read to you there, is that correct?

A That is absolutely correct. I think it is important to understand that there is—there are significant time intervals between the time experiments are done, the time that the material is written and published in the scientific literature and then an even greater span of time before that gets translated into textbooks. Textbooks are very far behind the time. They are a good useful summary of what has gone on in the past but they are not the source if one wants to know the most up to date information. What has been presented here in terms of the things that I'm doing and my independent understanding of other things that are going are in pertussis are in the forefront, not part of textbooks five or six years behind.

Q When you heard from several sources that the association of encephalopathy with the administration of the vaccine is at a rate of one in three hundred and ten (sic), where does that come?

A That comes from the National Childhood Encephalopathy Study, one of the figures that they use which have been subsequently revised.

Q This jury heard of the revision that is yet to be published, isn't that correct?

A That is my understanding.

Q Yes. Now, if we were to look at each of those, would see we the same thing? I picked this up. This is Plaintiff's Exhibit 712. For each comment there is the source for it. For example, there's the Footnote Number 1. You go to see and it said Cody–Baraff–Cherry. Whatever is being said what was found by Cody–Baraff–Cherry.

A That is correct.

Q Same thing we have in the texts?

A I'm sorry.

Q Is that the same type of thing that we have in the texts that were being quoted?

A Absolutely. General summary to sort of lay the background, peoples' interpretation of what is going on at the time that lead up to these sorts of studies being done. That doesn't mean by any means that that is—that's not representative of the opinions of the author with regard to causal relationships, for example.

Q Did anything that you and Mr. Warshafsky discussed [sic] in any way alter, modify, change any of the opinions that you gave this jury today?

A No, sir.

MR. WARSHAFSKY: Doctor, I have two questions.

MR. KNOPP: Excuse me.

## RE-CROSS EXAMINATION

BY MR. WASRSHAFSKY:

Q Two questions that are short. I will stay here if you don't mind, sir: How many hot lots did American Home Products and Wyeth produce in the years 1977 to 1982.

MR. KNOPP: Your Honor, objection, beyond the scope.

THE COURT: I'm going to let him answer.

A I'm glad you brought that up, Mr. Warshafsky.

Q I would like a number first.

A Well, I don't have that number.

Q My second question, Doctor, is—

A Do I get to finish? You said you wanted the number first.

Q Doctor, wait a minute, please. There is a role to be played by witnesses and role played by the Judge and lawyers.

THE COURT: Put your second question.

MR. KNOPP: Thank you, Your Honor.

Q Second question, Doctor, is do you know whether or not a shot that Michelle Graham got came from a CDC designated hot lot. I think that one you can tell us yes or no.

A From the discussion that went on yesterday, I believe that it did but I have not seen confirmation of that.

MR. WARSHAFSKY: No further questions, Your Honor.

RE–DIRECT EXAMINATION

BY MR. KNOPP:

Q You wanted to say something more about a hot lot?

A Yes. Thank you very much. I think the issue of hot lots—I have not followed all of the testimony. I don't know what's been discussed about it. I think the issue of hot lots is one that needs to be clarified.

MR. WARSHAFSKY: Doctor, if you haven't followed the testimony—

MR. KNOPP: Your Honor, if he has an objection, that is fine.

MR. WARSHAFSKY: I object, Your Honor.

THE COURT: Sustained.

BY MR. KNOPP:

Q Without your following the testimony, are you aware of hot lots?

A I'm sorry. Did I say something wrong?

THE COURT: **Simply said you didn't know what you were talking about.**

A I haven't followed the former testimony of all that has gone on in this trial is what I meant by that. I didn't mean—I have not read all of the testimony of witnesses prior to my appearance here. But I know that the issue of hot lots is an important one and the definition has been read to you ya'll, I know. From what we talked about here, the fact that thirty to fifty percent of children that receive pertussis vaccine have fever and at least the same number have local reactions. It's inconceivable to me that every lot that is made and released is not designated as a hot lot. Designation of hot lot—I know this from my interaction with my colleagues at the Center for Disease Control—was an operational definition intended for their use so that if there were reports that came in with regard to any particular lot, they could indicate to themselves that they want to keep track of those lots and see whether or not there were more cases that came—to follow that in general terms. The number of reactions that are required to designate a lot of pertussis vaccine as a hot lot is a very, very low number, one to be used only internally by them. Has no significance about the danger of that particular lot of vaccine by any means.

MR. KNOPP: Thank you, Doctor.

RE–CROSS EXAMINATION

BY MR. WARSHAFSKY:

Q What is that number, Doctor?

A I don't know. I told you.

MR. WARSHAFSKY: I see. Thanks.

(Trial Transcript, pp. 5313–5318 (bold emphasis added).)

Again, with a smile on my face, and in a chiding, friendly way, I said what is recited in this record. As I recall, the witness laughed, as did the jury, and the testimony proceeded. I am satisfied there was not a single person in the courtroom who took my remarks as sarcastic or hostile.

*Clinical Pediatrics*

The next example of my lack of impartiality, if not hostility, to Wyeth, is alleged to have occurred during the hearing on Wyeth's motion notwithstanding the verdict. At that time, one of Wyeth's grounds for a new trial was its assertion of newly discovered evidence in the form of a very recent article from *Clinical Pediatrics*. The article pertained to Cogen's apraxia. I declined to accept the article as a basis for a motion for new trial, stating as follows:

You're welcome to offer it. I'm going to overrule its admissibility insofar as its application here for a motion for new

trial. I haven't read it, of course, but I'm certain it is just not that compelling that somehow the trial court should set aside this entire jury trial in the face of all that this jury heard to receive new findings in connection with Cogen's apraxia.

(Transcript of 1/29/88 Hearing on Post–Trial Motions, p. 5.)

At most, what I did was to find that a cited magazine article is insufficient to require a retrial. It certainly suggests no indication of my unwillingness to consider relevant evidence. Again, under my theories of causation which I have in part addressed briefly herein, this article struck me as simply irrelevant. The circuit, of course, has broadened the standards of causation which should be applied and on retrial this document may be offered. Any error, however, reflects simple trial error and should not be considered as a basis for bias or prejudice.

*Trial Scheduling*

The defendant claims I lacked impartiality and deferred to plaintiff in scheduling the retrial of *Graham* in lieu of *Geisler by Geisler v. Wyeth Laboratories,* 716 F.Supp. 520 (D.Kan.1989). Actually, *Geisler* is set for trial as an alternate, and in the event *Graham* is settled or disposed of, *Geisler* will be taken up on June 18, 1991.

It is true that I scheduled *Geisler* at a time when we awaited the Tenth Circuit decision in *Graham.* I did this, in contemplation of that decision, by way of a telephone status conference with counsel. At that time, all of us waited for the *Graham* decision, and frankly I was optimistic that I would be affirmed. I also suggested to them that of equal importance would be the circuit's treatment of my rulings on the preemption question addressed in 666 F.Supp. 1483 (D.Kan.1987), and/or my treatment of the comment k. issue, i.e., is this product unavoidably unsafe, distinguishing the Kansas Supreme Court case in *Johnson v. American Cyanamid,* 239 Kan. 279, 718 P.2d 1318 (1986). We all agreed that if the circuit reversed the decision on these issues, then the Wyeth cases were resolved.

On receipt of the *Graham* decision, and for reasons stated in my letter of July 19, 1990, I rearranged the schedule. It was my view, as it is now, that the *Graham* case is deserving of retrial at the earliest possible time. While defense counsel has attached my July 19, 1990 letter explaining my reasoning, in the interest of clarity, I recite it here:

> The court acknowledges the written communication from counsel Knopp, in which he complains as to the court's scheduling of the jury trial in *Graham,* as opposed to *Geisler,* on October 23, 1990. In this, the court had previously scheduled *Geisler,* awaiting the mandate in *Graham.* However, with *Graham* decided, plaintiff counsel has requested that the retrial of *Graham* precede *Geisler,* and this court concurs.

> Both of these cases are deserving of jury trial as quickly as practicable and ample time has been allowed all counsel to prepare for trial in each. It is the court's practice to extend priority to any case which has been remanded for retrial, and such is the case in *Graham.*

> In sum, counsel for the litigants are advised to stand ready for trial in both cases. By this I mean that should *Graham* be disposed of prior to October 23, then *Geisler* will come on for trial at that time.

> This court has a hearing scheduled on September 4, 1990, at 9:30 A.M., pertaining to the Michaud firm's rights, if any, in these matters. On that date the court will be pleased to hear any other arguments offered by either side with regard to the timely trial of *Geisler.* At the moment, however, all are advised to stand ready to commence *Graham* on October 23, 1990.

Surely the scheduling of trials is a matter of court discretion, and I have exercised such discretion without the slightest suggestion of hostility or partiality.

*The September 17, 1990 Status Conference*

I address last the most serious of the defendant's complaints with regard to its claim of hostility manifested by me in the

course of a status conference on September 17, 1990. This unrecorded conference took place in my chambers during the interim when I was hearing Wyeth's motion to disqualify the Hutton law firm. The lawyers were here for the purpose of discussing the discovery requisites in the retrial of *Graham.* Both sides needed some clarity, as both sides have added witnesses and deleted others, and it was my intention to take up their respective positions in an informal way. (Dkt. No. 271.)

Wyeth, through its counsel, asserts that I expressed at that meeting my vehement disagreement with the conclusions of the Tenth Circuit's opinion, stating that the same must have been written by a clerk from the Third Circuit. Wyeth claims that I defended my exclusion of Dr. Cibis' testimony, commenting that the appellate panel did not understand evidentiary issues; moreover, that I referred to Dr. Cibis as a "bastard", insisting that Dr. Cibis could not have found that the plaintiff had already suffered a stroke at the time he examined her, because I knew that the child was neurologically normal.

I deny here that my conversations in this conference denote a sense of hostility toward witness Cibis or toward Wyeth, or that I have in any way chastised the Tenth Circuit Court of Appeals. In saying this, some preface is in order. I will reserve for the moment discussion of the description attributed to me about Dr. Cibis.

I am satisfied that something needs to be said about the nature of such conferences. The September status conference was no different than those conducted here on a regular basis. As opposed to some, I encourage meetings in chambers with the lawyers, informally and off the record. Indeed, if admissions are made or a substantive ruling needs to be taken up, I will call in my court reporter. These conferences typically pertain to regular and routine discovery and pretrial matters. I host these meetings almost daily. Indeed, they are often lively, candid and straightforward. In my view, they are always exercised in good humor. I happen to enjoy the presence of lawyers, their banter, the exchange, barbs and witticisms. I happen to believe that most of the lawyers who prac-

tice here welcome these meetings. Typically, much is learned by me in these settings, as lawyers are at ease. Mr. Knopp has participated in many such meetings from the outset of this case.

Additionally, some comment is in order with regard to the circuit's opinion and my treatment of it. Of course, no trial judge is at liberty to somehow publicly exclaim his views or criticisms on any decision from the appellate court. None of us does; each of us faithfully complies. Even so, every trial judge takes professional pride in his work product and naturally receives word of remand or reversal with a sense of regret or disappointment. In this case, to say I was disappointed is an understatement. My review of this record, in contemplation of the defendant's complaint and what I should do, reminds me of much of what took place here. I recall our hearings on the production of documents—a lively time—on and off the record. The in limine session was the same. The hours taken reaching decision on preemption or the unavoidably unsafe issue expended much of my time. The preparation for trial and my rulings consumed many evenings and weekends. Each event called for the crafting of detailed notes in preparation for hearing, for the purpose of extending my findings of fact and conclusions of law. The instruction session was another lively one, on and off the record. All of this represents an enormous expenditure of time. To be sure, I was most pleased when this case was completed. Now I am required to start anew. I am ever certain any trial judge will understand my feelings.

Probably more important is the mode in which the court was reversed. The decision rendered earlier was reversed for committing prejudicial trial error on matters never presented to the court, nor was it ever extended the courtesy of addressing them, i.e., to address my reasoning geared to the whole record. To say a trial judge should not review with the lawyers the thrust of a circuit opinion such as this, in contemplation of a next trial, is naive.

While I have no notes, I recall this meeting, which commenced with the reception of counsel in chambers. It was akin to a friendly rejoindure and the first since I heard the Geier matter. I opened the meeting with congratulations to defendant's counsel; we took up some discussion as to the import of the circuit opinion on the preemption question. I additionally expressed my personal disappointment with regard to the opinion for several reasons. First, I said that I owed the lawyers my regrets as this case had been remanded for trial error at my hand and through no fault of either of them.

We then took up the retrial of *Graham* and some discussion was repeated with regard to my reasons for commencing with it as opposed to *Geisler.* Mr. Knopp extended some rumblings which were not pressed seriously. We then addressed the purpose of our meeting, which had to do with the identity of certain new witnesses on both sides and the reasons for them. It was about this time that Mr. Knopp smilingly advised me that this case was not over, as Wyeth on that date had sought a writ of certiorari on the preemption question. Given that event, the court agreed that none of us needed to be timely troubled with trial schedules, and suggested that the lawyers simply await receipt of the opinion before they seriously entertained further discovery in this case. I recall allowing that given a split of authority within the circuits, the Supreme Court of the United States might reverse the Tenth Circuit and the case would be over.

In the course of the remaining moments, and in a chiding way, I addressed certain parts of the Tenth Circuit's opinion, particularly as it pertained to the application of some of Mr. Knopp's new experts. His new list did not include the likes of Dr. Cherry, a supposed authority in the field, and one I had taken considerable care to assure was available at the time of trial. I did raise the Dr. Cibis matter, chiding Mr. Knopp that on retrial he would surely call Dr. Cibis as a witness. I didn't need to discuss with him the fact that this witness was not one under Knopp's responsibility. I recall chiding Mr. Knopp with the thought that Mr. Herrington had offered

Dr. Cibis as a "ploy" with no serious intention to call him but rather to put in place some basis for error. I commended him for scoring on this point. I recall suggesting to Mr. Knopp that by all means Dr. Cibis should be here to testify, but I had some doubts as to whether Mr. Knopp would seriously entertain that proposition. At best, I took license with what I thought to be Mr. Knopp's usual good humor; nothing serious or hostile was ever intended or expressed.

I also expressed to Mr. Knopp my disappointment with the decision for two other reasons. I had him understand that I was disappointed that the circuit remanded this case on trial error which was not raised by the defendant at the time of the motion for new trial. I further recall having Mr. Knopp understand that if I have committed trial error which is prejudicial to the case, at the time of his motions I thought I should be permitted the courtesy of addressing it and explaining my reasons.

I also said to Mr. Knopp that I was disappointed with the fact that the circuit addressed trial error which was undoubtedly first raised in the appellate brief. In discussing this, I also said to Mr. Knopp that it appears that whomever assimilates this record, be it a staff attorney or law clerk, he probably has at best that which the appellant wants him to see. Given such a setting, it is apparent that there are occasions when an appellate panel will make judgments on the strength of what is before it and not necessarily on what the trial court found to be of interest. I know I said to Mr. Knopp that the circuit's opinion addresses a case that was not necessarily the whole case I heard. I recite this without the slightest sense of disrespect for the appellate court's opinion.

I recited my views to Mr. Knopp in what I thought was a straightforward way. I recited these views without the slightest sense of complaint. There was no reason for this gentleman to sense bias or hostility at my hands.

With regard to Dr. Cibis, as I stated to Mr. Knopp at the time of this hearing, I cannot in good conscience deny the descrip-

tive term attributed to me. I can say, however, that I have no recall of it and know of no reason why I would have said such a thing. I can only say that at ease, in the informal setting of my own chambers, and in the company of persons I respect and whose company I enjoy, I might have used this mode of expression.

Indeed, I regret any such remark, if made by me. If this term was used, it was a tasteless mode of expression. It meant nothing, and we should get on with the case. As stated earlier, I repeat here that nothing has ever been said by me, including this term (if used by me), which actually denotes any bias or hostility. Those thoughts have never existed and never have been expressed, and do not now exist.

IT IS ACCORDINGLY ORDERED this 13th day of March, 1991, that defendant's motion to disqualify (Dkt. No. 287) is denied.

Consistent with the purposes set forth in the court's memorandum of August 29, 1990, a next status conference in *Graham* is scheduled in the conference room of this court on April 26, 1991, at 2:00 P.M. Counsel are requested to have reviewed their lists of witnesses on whom they intend to rely, and if additional expert opinions are tendered, to bring with them the written reports of these witnesses, the same having been previously exchanged. The court contemplates putting in place a supplemental final pretrial order and taking up any other matters which may arise. The *Graham* matter will commence jury trial on June 18, 1991.